30 F.3d 524
 65 Fair Empl.Prac.Cas. (BNA) 696, 63 USLW 2069
 Lisa M. BEARDSLEY, Plaintiff-Appellee,
v.
John WEBB, Defendant-Appellant,
and
John R. ISOM, Sheriff of Loudoun County, individually and in
his official capacity, Defendant.
Lisa M. BEARDSLEY, Plaintiff-Appellant,
v.
John R. ISOM, Sheriff of Loudoun County, individually and in
his official capacity; John Webb, Defendants-Appellees.
 Nos. 93-1732, 93-1747.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 7, 1994.
Decided July 26, 1994.
 
 ARGUED: John J. Brandt, Slenker, Brandt, Jennings & Johnston, Merrifield, VA, for appellants. John Michael Bredehoft, Charlson & Bredehoft, P.C., Fairfax, VA, for appellee. ON BRIEF: Robert S. Corish, Slenker, Brandt, Jennings & Johnston, Merrifield, Virginia, for Appellants. Elaine C. Bredehoft, Charlson & Bredehoft, P.C., Fairfax, VA, for appellee.
 Before PHILLIPS, Circuit Judge, BUTZNER, Senior Circuit Judge, and YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.
 Affirmed by published opinion. Senior Judge BUTZNER wrote the opinion, in which Judge PHILLIPS and Senior Judge YOUNG joined.
 OPINION
 BUTZNER, Senior Circuit Judge:
 
 
 1
 The principal issue in this appeal is whether provisions of the Civil Rights Act of 1991 for trial by jury to recover compensatory and punitive damages make Title VII of the Civil Rights Act of 1964 the exclusive remedy for claims of employment discrimination brought by public employees. See 42 U.S.C. Secs. 1981a(a)-(b) (damages) and (c) (jury) (Supp. IV 1992). The district court held that Title VII was not the exclusive remedy for employment discrimination claims, 828 F.Supp. 397. It allowed Lisa M. Beardsley, a former employee of the Loudoun County, Virginia, sheriff's office, to maintain her 42 U.S.C. Sec. 1983 action against her supervisor, John Webb, and Sheriff John R. Isom. From a judgment entered on the jury's verdict awarding damages to Beardsley for discrimination Webb appeals. Beardsley cross-appeals the court's summary dismissal of her other claims against Webb and Isom. Finding no reversible error among the many assigned, we affirm.
 
 
 2
 * Webb contends that provisions of the Civil Rights Act of 1991 that allow the recovery of damages and provide for trial by jury establish that Title VII is the sole remedy for sexual harassment. Consequently, he argues, the 1991 Act precludes Beardsley from bringing an action under Sec. 1983 and the district court erred by denying his motion to dismiss. He asserts that Congress intended the Act to provide sufficient remedies because its stated purpose is to provide "appropriate remedies" for unlawful harassment. Pub.L. No. 102-166, Sec. 3 (codified at 42 U.S.C. Sec. 1981, note (Supp. IV 1992)). He also points out that the Act explicitly does not limit Sec. 1981 but is silent with respect to any limitation of Sec. 1983. See 42 U.S.C. Sec. 1981a(b)(4) (Supp. IV 1992). This omission, he claims, makes it reasonable to assume that the Act precludes suits for sexual harassment under Sec. 1983.
 
 
 3
 This and other circuits have long recognized that prior to 1991 Congress did not intend Title VII to be the sole remedy for a public employee's claim of employment discrimination. The reasons for concluding that Congress preserved a cause of action under Sec. 1983 have often been explained; they need not be repeated here. See Alexander v. Gardner-Denver Co., 415 U.S. 36, 48-49, 94 S.Ct. 1011, 1019-20, 39 L.Ed.2d 147 (1974); Keller v. Prince George's County, 827 F.2d 952, 956-63 (4th Cir.1987). In light of appellate case law that Title VII and Sec. 1983 co-exist to afford relief for employment discrimination, it is quite unlikely that Congress implicitly intended the 1991 Act to bar claimants from seeking relief under Sec. 1983. It is more reasonable to presume that Congress intended both avenues of relief to remain open. See Lorillard v. Pons, 434 U.S. 575, 580, 98 S.Ct. 866, 869, 55 L.Ed.2d 40 (1978).
 
 
 4
 We are unable to accept Webb's argument that Congress intended Title VII to be a sufficient remedy for employment discrimination. The purpose of the Act to provide "appropriate" remedies must be read along with the congressional finding that "additional remedies under Federal law are needed to deter unlawful harassment and intentional discrimination in the workplace." Pub.L. No. 102-166, Sec. 2 (codified as 42 U.S.C. Sec. 1981, note (Supp. IV 1992)). It would be perverse to conclude that the Congress that provided additional remedies simultaneously intended silently to extinguish the remedy that Sec. 1983 has provided for many years.
 
 
 5
 Also misplaced is Webb's contrast of the savings clause for Sec. 1981 with the absence of a similar clause for Sec. 1983 to buttress his claim that Congress implicitly abolished remedies that Sec. 1983 had previously afforded. The 1991 Act overruled Patterson v. McLean Credit Union, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), which limited Sec. 1981 by excluding from its scope conduct that occurs after the formation of a contract. 491 U.S. at 175-85, 109 S.Ct. at 2371-77; see 42 U.S.C. Secs. 1981(b) and (c) (Supp. IV 1992). Congressional concern with the scope of relief underSec. 1981 does not establish that Congress intended to limit the scope of relief under Sec. 1983. See Stoner v. Department of Agriculture, 846 F.Supp. 738, 740-41 (W.D. Wis.1994).
 
 
 6
 Webb's argument that the remedies the 1991 Act added to Title VII obviate the need for the remedies afforded by Sec. 1983 is based on a flawed premise. Title VII and Sec. 1983 are not co-extensive in every respect. For example, Title VII does not apply to employers with less than 15 employees. 42 U.S.C. Sec. 2000e(b). Section 1983 contains no similar limitation.
 
 
 7
 In Alexander v. Gardner-Denver Co., the Court observed:
 
 
 8
 [T]he legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes. The clear inference is that Title VII was designed to supplement, rather than supplant, existing laws and institutions relating to employment discrimination.
 
 
 9
 415 U.S. at 48-49, 94 S.Ct. at 1019-20 (citation omitted). Nothing in the text of the Civil Rights Act of 1991 or in its legislative history contradicts the Court's recognition that Title VII does not supplant Sec. 1983. See also Stoner, 846 F.Supp. 738; contra Marrero-Rivera v. Department of Justice of the Commonwealth of Puerto Rico, 800 F.Supp. 1024 (D.P.R.1992). The district court properly denied Webb's motion to dismiss.
 
 II
 
 10
 Beardsley began working for the Loudoun County, Virginia, sheriff's office in 1984. She was promoted to Field Operations Sergeant in 1988 and to Second Lieutenant in 1989, becoming the highest ranking female in the department. First Lieutenant Webb supervised Beardsley in 1991 from the summer to October. No incidents occurred during this period. Webb again supervised Beardsley from March 1992 until Beardsley resigned in August 1992. The incidents that prompted Beardsley's lawsuit occurred during this period. Because the jury returned a verdict in Beardsley's favor, we review the evidence on this issue in the light most favorable to her.
 
 
 11
 In May 1992, Webb called Beardsley "honey" and "dear" in front of subordinates. Beardsley asked Webb to stop using these terms. Shortly after these encounters, Webb stood behind Beardsley during roll call and touched her shoulders. When Beardsley informed him that the touching made her and her husband, a member of the department who was present at roll call, uncomfortable, Webb massaged her shoulders while staring at Beardsley's husband. For a period of time after this incident, whenever Beardsley arranged on her car radio to meet with a deputy, Webb would show up at the meeting without an apparent professional purpose.
 
 
 12
 Webb unjustifiably accused Beardsley of having an affair with a deputy, Sergeant Noble. When Beardsley offered to drive Noble to an automobile repair shop to pick up a patrol car, Webb stated that this was an excuse for her and Noble to "kiss face" in the parking lot.
 
 
 13
 Webb asked Beardsley what kind of underwear she wore. She responded that it was none of his business. Webb retorted that he "was just wondering how something so small could be so comfortable." On another occasion, when Beardsley indicated she was planning on taking maternity leave, Webb asked her why she would want to do that to her body. He then asked what type of birth control she used. Beardsley protested to Webb that these questions and comments were inappropriate.
 
 
 14
 When Webb had to pick up his patrol car from the repair shop, he insisted that Beardsley drive him because "it was his turn to make out in the parking lot" with Beardsley. She told him that his statement was not funny. After another officer offered to drive him, Webb repeated that it was his turn to have his way with her. Webb ordered Beardsley to drive him and she complied. During the drive, Beardsley reiterated that Webb's behavior was not funny and that she did not want to have to put up with it. Webb responded that she had chosen to work "in a field primarily occupied by men" and that if she didn't like it she could "just get out."
 
 
 15
 Webb's behavior then changed. Instead of giving her unwanted attention, Webb gave her the cold shoulder. When he did talk to her, he was curt. He regularly criticized her performance. He questioned her orders. When she confronted him about his conduct, he initially just stared at her and then accused her of having no sense of humor.
 
 
 16
 At this point, Beardsley met with Sheriff Isom to complain about Webb's behavior. Webb did not change. Her squad began to become insubordinate, bypassing the chain of command and reporting only to Webb. Webb in turn bypassed Beardsley to give orders directly to her deputies, hampering her efforts to run her shift.
 
 
 17
 Beardsley again complained to Sheriff Isom. She also met with Webb who tried to persuade her to drop her complaint against him. She did not, and matters went from bad to worse.
 
 
 18
 In response to a question that requested Beardsley to tell the jury why she quit, Beardsley testified:
 
 
 19
 Lieutenant John Webb specifically turned three complaints that we have already been over here around on me. He wrote an investigation requesting internal affairs on me with several fictitious facts and outright lies. He said there were witnesses to things that weren't there and that will testify today that they never talked to John Webb and never said that.
 
 
 20
 After that was turned on me and John Webb was the one responsible for initially investigating the incident between Sergeant Williams and I, they turned that around on me as well, and I didn't think I was getting a fair shake in that department. I didn't think I was ever going to get a fair shake anymore. They wanted me out.
 
 
 21
 I made a complaint on John Webb, and they weren't going to investigate it, but they were certainly going to investigate me.
 
 
 22
 The three complaints and the Sergeant Williams incident to which Beardsley referred involved her attempts to discipline members of her squad. The evidence discloses that Webb did not treat others whom he supervised in the manner that he treated Beardsley.
 
 
 23
 Beardsley brought this action against Webb and the sheriff, alleging in her Sec. 1983 claim harassment and discrimination because of her sex in violation of the Fourteenth Amendment and several claims based on state law. The district court granted the sheriff summary judgment and dismissed some of the state law claims. Beardsley voluntarily withdrew other state law claims. A jury was impanelled to try her Sec. 1983 claim against Webb. It returned a verdict in her favor for $76,044 compensatory damages and $8,000 punitive damages. The district court entered judgment on the verdict and denied Webb's postjudgment motions. Webb appeals this judgment, and Beardsley cross-appeals the district court's adverse summary judgment dismissing her state law claims and dismissing her claims against the sheriff.
 
 III
 
 24
 Webb asserts that Beardsley's evidence failed to establish a prima facie case of sexual harassment. He argues that the judge erred as a matter of law by submitting the claim to the jury. He also contends that the court should have dismissed Beardsley's claim of retaliation because she did not allege a violation of the First Amendment. Webb asserts the defense of qualified immunity and that Beardsley was not entitled to punitive damages as a matter of law.
 
 
 25
 The equal protection clause confers a right to be free from gender discrimination that is not substantially related to important governmental objectives. Davis v. Passman, 442 U.S. 228, 234-35, 99 S.Ct. 2264, 2271, 60 L.Ed.2d 846 (1979). Applying this precept, courts have held that intentional sexual harassment of employees by persons acting under color of state law violates the Fourteenth Amendment and is actionable underSec. 1983. See, e.g., Pontarelli v. Stone, 930 F.2d 104, 113-14 (1st Cir.1991); Bohen v. City of East Chicago, 799 F.2d 1180, 1185 (7th Cir.1986). Courts may apply the standards developed in Title VII litigation to similar litigation under Sec. 1983. See Boutros v. Canton Regional Transit Auth., 997 F.2d 198, 202-03 (6th Cir.1993); Trautvetter v. Quick, 916 F.2d 1140, 1149 (7th Cir.1990).
 
 
 26
 Sexual harassment creating a hostile or abusive atmosphere in the workplace gives rise to a claim of sex discrimination under Title VII. Meritor Savings Bank v. Vinson, 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). To violate Title VII, conduct must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." 477 U.S. at 67, 106 S.Ct. at 2405 (citations, internal brackets, and internal quotation marks omitted). Whether a party has established a hostile working environment under Title VII "can be determined only by looking at all the circumstances, [including] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Systems, Inc., --- U.S. ----, ----, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993).
 
 
 27
 Webb's sexual innuendos and proposals together with his other discriminatory conduct were sufficiently severe and pervasive to make out a sexual harassment claim. In combination, his acts altered the conditions of Beardsley's employment and created an objectively abusive work environment. See Harris, --- U.S. at ----, 114 S.Ct. at 370. Beardsley's relationship with her subordinates and then with her supervisors suffered from the continued pattern of Webb's discriminatory comments and behavior that undermined her standing and authority in the department. Webb's conduct caused her to suffer severe depression requiring professional treatment.
 
 
 28
 Webb offered defenses of denial, self-justification, characterization of conduct as jokes not harassment, and alternative reasons for Beardsley's dissatisfaction and departure. Whether the evidence supported Beardsley's claim or Webb's defenses depended largely on the credibility of the witnesses and the inferences the jury could reasonably draw from the facts. Whether Webb's "harassment was sufficiently severe or pervasive is quintessentially a question of fact." Paroline v. Unisys Corp., 879 F.2d 100, 105 (4th Cir.1989), vacated in part on other grounds 900 F.2d 27 (4th Cir.1990) (en banc).
 
 
 29
 Webb's claim that the evidence was insufficient as a matter of law to establish a prima facie case and to sustain the verdict lacks merit. Beardsley satisfied the standards set forth in Meritor and Harris. The district court did not err by denying Webb's motions for judgment that he submitted during and after the trial.
 
 
 30
 We also conclude that Beardsley's sole reliance on the Fourteenth Amendment without reference to an infringement of the First Amendment is not fatal to her claim of retaliation. A violation of the First Amendment's protection of the right to speak out is a necessary predicate to a claim of pure retaliation in the context of adverse employment action after the claimant has voiced a grievance. See, e.g., Gray v. Lacke, 885 F.2d 399 (7th Cir.1989).
 
 
 31
 Beardsley's claim of retaliation is that Webb continued to discriminate against her after she related to the sheriff Webb's overt sexual harassment. Having been criticized by his superiors, he no longer made sexual advances, but his discriminatory conduct continued. He treated her adversely unlike the way he treated men subject to his command. Webb's conduct after his superiors censured him was a mixture of retaliation and continued sexual harassment. Webb's refusal to speak to her and his use of sergeants to relay orders was not consistent with the professional relationship of a superior officer and his subordinate. Instead, it was more like the conduct of a spurned suitor. His conduct maintained and reinforced the hostile work environment that he had created. Under these circumstances, the district court did not err by including retaliation among the issues submitted to the jury.
 
 
 32
 Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), explains the standards that govern the defense of qualified immunity:
 
 
 33
 [W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action ... assessed in light of the legal rules that were "clearly established" at the time it was taken....
 
 
 34
 483 U.S. at 639, 107 S.Ct. at 3038 (citations omitted). The Court emphasized that the right must be clearly established in a particularized relevant sense:
 
 
 35
 The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent.
 
 
 36
 483 U.S. at 640, 107 S.Ct. at 3039 (citations omitted).
 
 
 37
 The issue, therefore, is whether an officer could reasonably have thought, in light of clearly established law, that Webb's conduct was consistent with Beardsley's rights to be free from discrimination. See Anderson, 483 U.S. at 638, 107 S.Ct. at 3038. The test is objective; Webb's subjective beliefs about the propriety of his conduct are irrelevant. See Anderson, 483 U.S. at 641, 107 S.Ct. at 3039.
 
 
 38
 Webb's conduct occurred during the period from March to August 1992. We have already noted that in 1978 the Supreme Court wrote that the equal protection clause confers on a public employee a federal constitutional right to be free from gender discrimination, Davis v. Passman, 442 US. at 234-35, 99 S.Ct. at 2271, and that sexual harassment has long been recognized to be a type of gender discrimination. See Bohen v. City of East Chicago, 799 F.2d at 1185. There is no need to recount all of Webb's conduct. No male officer could reasonably have thought in 1992 that it was not sexual harassment to announce that it was his turn to make out with a woman who was subject to his command, especially when the woman had previously protested his gender oriented behavior. We conclude that the district court did not err in denying Webb qualified immunity.
 
 
 39
 The district court granted summary judgment to Sheriff Isom on all counts against him including constructive discharge. Webb contends that he is not liable for constructive discharge because he was not Beardsley's employer.
 
 
 40
 The district court did not impose liability on Webb for constructive discharge. The district court ruled that while constructive discharge was not an issue in the jury trial, the question of causation remained, and Beardsley could show that the reason she resigned was because of Webb's actions. In its instructions the court cautioned the jury that Webb was not responsible for harm to Beardsley caused by others and that she must prove that her damages were proximately caused by Webb. We find no error in the court's ruling or its instructions.
 
 
 41
 We cannot accept Webb's argument that Beardsley is not entitled to punitive damages as a matter of law. The court instructed the jury that they could only award punitive damages if they found the defendant's acts were malicious or wanton or oppressive or willful. The court also explained that an act is maliciously done if prompted by ill will, spite, or grudge; that it is willful or wanton if done in reckless or careless disregard of or indifference to the rights of another person; and that it is oppressively done if it injures another by unnecessary harshness or severity as by misuse of power or authority. Webb offered no objection to the definitions in these instructions.
 
 
 42
 Webb's conduct was sufficiently egregious to create a question for the jury to determine whether it met the standards for punitive damages outlined by the court. After Beardsley remonstrated with Webb about his conduct toward her, he said that she chose to work in a field occupied primarily by men, and if she didn't like it she could "just get out." When Beardsley did not "get out" the evidence of his subsequent conduct to get her out amply justified the jury's award of punitive damages.
 
 IV
 
 43
 Webb also argues that Bockes v. Fields, 999 F.2d 788 (4th Cir.1993), mandates that we grant him immunity under the Eleventh Amendment because he is insured through the Virginia State Division of Risk Management Insurance Plan. In Bockes, we held that a local board and department of social services were agencies immune under the Eleventh Amendment because their liability would be covered by insurance for which Virginia paid 80% of the premium. 999 F.2d at 790-91.
 
 
 44
 In contrast, the claim on which Beardsley prevailed was not brought against an agency or an officer in his official capacity. It was brought against Webb in his individual capacity. "[T]he Eleventh Amendment does not erect a barrier against suits to impose 'individual and personal liability' on state officials under Sec. 1983." Hafer v. Melo, 502 U.S. 21, ----, 112 S.Ct. 358, 364, 116 L.Ed.2d 301 (1991) (citation omitted). Several courts have held that despite state indemnification the Eleventh Amendment does not bar actions against officers sued in their individual capacity. See, e.g., Jackson v. Georgia Dept. of Transp., 16 F.3d 1573, 1577-78 (11th Cir.1994); Griess v. Colorado, 841 F.2d 1042, 1046-47 (10th Cir.1988); Duckworth v. Franzen, 780 F.2d 645, 650-51 (7th Cir.1985); Demery v. Kupperman, 735 F.2d 1139, 1147 (9th Cir.1984); Downing v. Williams, 624 F.2d 612, 626 (5th Cir.1980), vacated on other grounds, 645 F.2d 1226 (5th Cir.1981).
 
 
 45
 Moreover, Webb has failed to prove that state funds are involved. The question of insurance arose after judgment when the question of a supersedeas bond to secure the judgment against Webb was submitted to the court. In a motion to stay enforcement of the judgment Webb's counsel stated:[T]he defendant is covered, for both the compensatory and punitive damages, in addition to attorneys' fees and costs, by a state funded risk management plan up to the limit of $1,000,000.00. This coverage will be more than adequate to cover any principal verdict on appeal plus costs and attorneys' fees.
 
 
 46
 Notably, Webb did not cite any statute to support his representation about the insurance being state funded. Beardsley, nevertheless, accepted the representation, and the parties stipulated that a supersedeas bond was unnecessary. Now Webb has reversed course, claiming that the Eleventh Amendment bars this action because, in his opinion, he will be indemnified by the state. Again he cites no statute and no case that supports his argument.
 
 
 47
 Webb is not a Virginia state policeman. He is a deputy sheriff of Loudoun County. Beardsley has shown that the indemnification provided to Webb is governed by Virginia Code Sec. 2.1-526.8:1 (1987). This statute provides for voluntary coverage of local subdivisions and their constitutional officers. Premiums and costs for insurance are paid by the participating governmental entities. They are not paid by the state. Webb cites no authority to the contrary. The immunity conferred by the Eleventh Amendment does not "afford protection to political subdivisions such as counties...." Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 401, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401 (1979).
 
 
 48
 Webb has failed to show that this action is barred by the Eleventh Amendment.
 
 V
 
 49
 We find no cause for reversal in the errors Beardsley assigned in her cross-appeal.
 
 
 50
 The judgment of the district court is affirmed.
 
 
 51
 AFFIRMED.