**Jimmie NELSON, Plaintiff,**

v.

**Officer Tim STRAWN and The City of Moncks Corner, Defendants.**

**Civ. A. No. 2:93–0066–18.**

United States District Court,
D. South Carolina,
Charleston Division.

Aug. 25, 1995.

---

Jimmie Nelson, Bennettsville, SC, pro se.

Sandra J. Senn, Charleston, SC, for defendants.

### ORDER

NORTON, District Judge.

This is a *pro se* action filed by a former pretrial detainee against a City of Moncks Corner police officer and the City of Moncks Corner (City). The issues before this court on cross-motions for summary judgment are (1) qualified immunity, (2) Eleventh Amendment immunity, and (3) municipal liability. In accordance with 28 U.S.C. § 636(b)(1)(B), a United States Magistrate Judge issued a recommendation that Defendants' Motion for Summary Judgment be granted and that Plaintiff's Motion for Summary Judgment be denied. This court accepts the Report & Recommendation with the modified analysis set forth below.

### I. BACKGROUND

Plaintiff Jimmie Nelson alleges that on March 1, 1990, Defendant Strawn, while acting in his capacity as an officer with the City of Moncks Corner Police Department, arrested Nelson for setting fire to his cell at the Berkeley Country jail and "exciting (sic) a riot." Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. at 2. Nelson asserts that Strawn had no probable cause for the arrest and that Nelson was never prosecuted for the offense. Plaintiff also asserts that Strawn used excessive force in effecting the arrest.

Nelson filed suit on November 30, 1992; however, due to procedural problems, he was allowed to amend his Complaint after the magistrate judge originally recommended summary dismissal due to improper pleadings. The Complaint was amended in early 1993.

On July 12, 1993, Defendants filed a Motion for Summary Judgment and a few days later filed a Motion for Sanctions, Attorneys Fees, and Injunction. On January 7, 1994, a Report and Recommendation was entered by United States Magistrate Judge Robert S. Carr recommending that Defendants' summary judgment motion be denied. No objection was filed, and this court accepted the magistrate judge's recommendation on February 1, 1994. On March 30, 1994, Defendants again moved to dismiss on separate grounds. On January 12, 1995, the magistrate judge recommended that Defendants' motion be granted based on qualified immunity and failure to show municipal fault.

A party may object, in writing, to a magistrate judge's report within ten days after being served with a copy of that report. 28 U.S.C. § 636(b)(1). Three days are added to the ten-day period if the recommendation is mailed rather than personally served. Nelson filed his timely written objection with the court on January 20, 1995. Nelson filed a "Second Objection" on January 25, 1995. Defendants filed their objection on January 27, 1995. Plaintiff filed opposition to Defendants' objection on February 6, 1995.

This court is charged with conducting a *de novo* review of any portion of the magistrate judge's report to which a specific objection is registered and may accept, reject, or modify, in whole or in part, the recommendations contained in that report. 28 U.S.C. § 636(b)(1).

### II. CROSS–MOTIONS FOR SUMMARY JUDGMENT[1]

#### A. Summary Judgment Standard

Rule 56(c) requires that the district court enter judgment against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). To prevail on a motion for summary judgment, a party must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that it is entitled to judgment as a matter of law.

---

**1.** Defendants actually filed a Motion to Dismiss, which is being treated as a summary judgment motion because of affidavits that must be considered, and Nelson never technically filed a motion for summary judgment, though certain of his ambiguous filings have been construed throughout the course of this litigation as a motion for summary judgment.

*See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material fact has been raised, the court construes all inferences in favor of the non-moving party. *See id.* at 257–58, 106 S.Ct. at 2514–15. If, however, "the evidence is so one-sided that one party must prevail as a matter of law," summary judgment is appropriate. *Id.* at 251–52, 106 S.Ct. at 2511–12. A party "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another." *See Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985). To survive a summary judgment motion, the non-movant may not rest on his or her pleadings, but must demonstrate that specific, material facts exist that give rise to a genuine issue. *See Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. As the *Anderson* Court explained, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 244, 106 S.Ct. at 2508.

### B. Qualified Immunity

█ The magistrate judge recommended that Officer Strawn be shielded by qualified immunity. Strawn had raised the issue of qualified immunity before it was determined that he was being sued only in his official capacity, which was established by Order of the magistrate judge on November 15, 1994. Qualified immunity is available only in an individual-capacity suit. *Kentucky v. Graham,* 473 U.S. 159, 166–67, 105 S.Ct. 3099, 3105–06, 87 L.Ed.2d 114 (1985). Therefore, the magistrate judge's recommendation cannot be accepted on this ground. Defendant Strawn, in his official capacity, is not entitled to qualified immunity.

### C. Eleventh Amendment Immunity

█ Defendants also raise Eleventh Amendment immunity as a defense, saying that any recovery against either Defendant in this action would be paid by the State Insurance Reserve Fund and thus would be a judgment against the State of South Carolina.

█ The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Although by its terms the Eleventh Amendment applies only to suits brought against a state by "Citizens of another State," it is well established that "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974). This immunity extends as well to state agencies and other government entities properly characterized as "arm[s] of the State." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977). Like the state itself, state officers acting in their official capacities are also shielded by Eleventh Amendment immunity because "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," and "[a]s such, it is no different from a suit against the State itself." *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989). A state and its officer are not protected by the Eleventh Amendment, however, when a plaintiff seeks only prospective, injunctive relief, because such relief does not amount to federal interference with a state treasury. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

Though the Eleventh Amendment bars a damages action against a state in federal court, it has traditionally erected no jurisdictional bar to suits against local governmental entities. *Will,* 491 U.S. at 70, 109 S.Ct. at 2312. Recently, however, some courts have extended this bar to federal suits against state-insured local governments based on the premise that judgments against them would be partially paid from state funds. *Bockes v. Fields,* 999 F.2d 788 (4th Cir.1993); *Cromer v. Brown,* Civ. Ac. No. 6:92–3555–20AK

(D.S.C. Feb. 28, 1994). Defendants seek to avail themselves of the protection afforded by this extension of traditional Eleventh Amendment immunity.

Clearly, a defense based on the Eleventh Amendment is properly an issue in an official-capacity suit. *Hafer v. Melo,* 502 U.S. 21, 30–31, 112 S.Ct. 358, 364–65, 116 L.Ed.2d 301 (1991). However, whether these particular Defendants may invoke Eleventh Amendment immunity is a different question, and one that the magistrate judge resolved against Defendants. The City and Officer Strawn rely on *Bockes v. Fields,* 999 F.2d 788 (4th Cir.1993), which cloaks a county department and board of social services with Eleventh Amendment immunity because the Commonwealth of Virginia paid for 80% of the insurance policy covering their activities. The magistrate judge distinguished the case at hand from *Bockes,* saying Defendants failed to show that South Carolina's insurance program for municipalities is sufficiently state-funded, as was the Virginia program at issue in *Bockes.* The magistrate judge also relied on *Beardsley v. Webb,* 30 F.3d 524 (4th Cir.1994), in which a federal court in Virginia, finding a state insurance policy to be an insufficient link, declined to shield a county deputy sheriff with Eleventh Amendment immunity. However, in *Beardsley,* the defendant was sued in his individual capacity, and though he tried to cloak himself in Eleventh Amendment immunity by virtue of his voluntary subscription to a state liability insurance plan, the court held that such indemnification for individual liability did not in-voke Eleventh Amendment protection. Significantly, in *Beardsley,* as here, the premiums and costs for insurance were paid by the participating governmental entities, not by the state. Nevertheless, the reasoning in *Beardsley* does not compel a like decision in this case, because all Defendants here are sued in their official capacities; thus, state indemnification for *personal* liability arising from official action is not precisely the issue.

A federal district court in this state has held that a sheriff's office and deputy sheriff sued in his official capacity were entitled to Eleventh Amendment immunity by virtue of their coverage by the South Carolina Insurance Reserve Fund. *Cromer v. Brown,* Civ. Ac. No. 6:92–3555–20AK (D.S.C. Feb. 28, 1994). The Insurance Reserve Fund functions as a voluntary insurance pool for governmental entities that operate in South Carolina. State agencies, local governments, school boards, and other government organizations are eligible to purchase property, liability, and other types of insurance through the Insurance Reserve Fund.[2] In *Cromer,* an Assistant Division Director of the South Carolina Budget and Control Board, who serves as the head of the Insurance Reserve Fund, testified that the Fund is funded 41% by premiums paid by state agencies and 59% by premiums paid by other subscribing entities, such as counties and cities. Trussell Tr. at 8. Based on this information, the court found that Cromer's suit was an attempt to recover against funds of the state treasury and therefore barred by the Eleventh Amendment.[3]

---

**2.** The Insurance Reserve Fund began as part of the state's "sinking fund" for insuring state-owned property. A sinking fund is an account into which deposits are made to pay for future expenses. The general sinking fund was established by the state in 1870. In 1900, the insurance sinking fund was established as part of the general sinking fund to insure public buildings. In 1916, public school buildings were specifically covered. Various acts changed provisions governing the fund, and in 1975 the name was changed to the South Carolina Insurance Reserve Fund. As of June 30, 1993, the Insurance Reserve Fund insured approximately $14 billion of governmental property, over 32,000 vehicles for liability, 190,000 governmental employees for tort liability, more than 5,000 school buses and 450,000 school bus passengers for school bus liability and pupil injury coverage, and approxi-mately 1,700 physicians and dentists and 31 hospitals for professional liability. The Insurance Reserve Fund is responsible for writing insurance policies, establishing rates, investigating, setting, and defending claims, and purchasing appropriate reinsurance to protect the fund from excessive losses. South Carolina Legislative Audit Council, *A Review of the South Carolina Insurance Reserve Fund* (Aug. 1995) [hereinafter *Insurance Reserve Fund Review* ].

**3.** In *Cromer,* a finding of Eleventh Amendment immunity on the basis of state-funded insurance coverage was unnecessary, since both defendants—the sheriff and the sheriff's office—were arms of the state, as the court recognized, and thereby immune without regard to insurance coverage. *See Gulledge v. Smart,* 691 F.Supp. 947 (D.S.C.1988) (South Carolina sheriffs are

The magistrate judge in the case at hand wrote that it was "the utmost in bad faith" for Defendants to attempt to avail themselves of Eleventh Amendment immunity. Report & Recommendation at 7. In light of *Cromer* and *Bockes,* this court disagrees. Defendants' argument can certainly be made in good faith; however, this court is not ready to adopt the *Cromer* approach and resolve this issue in favor of Defendants. It is true that the Insurance Reserve Fund is paying the attorneys defending this action and that the Insurance Reserve Fund is managed by the State of South Carolina,[4] but it does not necessarily follow that the State treasury is paying for the defense of this action or satisfying any judgment that might result. "The Insurance Reserve Fund is funded with funds it earns, and it receives no general fund appropriations." South Carolina Legislative Audit Council, *A Review of the South Carolina Insurance Reserve Fund* at 3 (Aug. 1995). A percentage of the money in the Insurance Reserve Fund came from the City of Moncks Corner, and the City is presently receiving the benefits of the premiums it paid to be insured by the Insurance Reserve Fund. To hold that a city police officer in South Carolina is entitled to the immunity provided "one of the United States" by the Eleventh Amendment, simply because the City pays insurance premiums to a fund managed by a state entity distorts the immunity the Constitution provides. The City is not required to obtain insurance from the state,[5] and in fact not all cities in South Carolina do. Trussell Tr. at 5. Were we to hold the City of Moncks Corner entitled to immunity because of its choice of insurance carriers, we would create a situation in which some cities in South Carolina could not be sued in federal court while other cities could. This chaotic result is not necessary or desirable.

It is true that the State, through its management, is responsible for the investment income that the premiums earn for the Fund. Further, the Fund was initially capitalized with State money. Trussell Tr. at 7 ("the trust account is made up of the initial appropriation which capitalized the fund, plus investment income on that fund, plus premium income.") Finally, the State has twice recapitalized the Insurance Reserve Fund during financial insolvency. *Id.* at 7–8 ("The Insurance Reserve Fund went broke twice in the '30s and each time was recapitalized by the General Assembly. We have maintained it without going broke since that time.") These few links to state funding, however, are far too tenuous to consider the Insurance Reserve Fund "state funds" for Eleventh Amendment purposes.[6]

As far as this court can tell, today's holding is not at odds with the Fourth Circuit's holding in *Bockes* based on the Commonwealth's Public Officials Liability Self–Insurance Plan. There, it appears that the Commonwealth of Virginia paid 80% of premiums *on behalf of* the subscribing agencies, such as the defendant Grayson County Board of Social Services, and the agencies themselves paid the other 20%. *Bockes,* 999 F.2d at 790. Here, the State of South Carolina pays 41% of the premiums, but not *on behalf of* subscribing counties and cities. That 41% contribution is the state paying premiums to cover its own agencies. As far as this court can tell from Defendants' submissions, each city in South Carolina that subscribes pays 100% of its premium. Those premiums are commingled with other premiums in the

state constitutional officers with jurisdiction in the counties in which they are elected).

**4.** The state treasurer is responsible for all investments and deposits of the Insurance Reserve Fund's revenue. The Insurance Reserve Fund is a section of the State Budget and Control Board's Office of Insurance Services. The Internal Operations division of the State Budget and Control Board bills and collects premiums for the Fund. *Insurance Reserve Fund Review* at 2–3.

**5.** State agencies, on the other hand, are required to buy from the Insurance Reserve Fund if they want to buy insurance. Trussell Tr. at 8–9. Cities are under no such mandate. They can insure, not insure, or self-insure, and they can purchase insurance from any insurer. Trussell Tr. at 5.

**6.** The chances of the State of South Carolina's general treasury being called on to rescue the Insurance Reserve Fund are slim, considering the $120,168,358 surplus in the Fund as of June 30, 1994. *Insurance Reserve Fund Review* at 5, Table 1.1.

Fund, which is comprised 41% of premiums paid by the state for its agencies.

The Fourth Circuit has stated that "[w]hen the action seeks damages that would be satisfied by state funds, . . . no further inquiry is necessary." *Bockes,* 999 F.2d at 791. This statement was slightly modified in a recent Fourth Circuit case that stated a "determination that the state treasury will be liable for a particular judgment is largely, if not wholly, dispositive of entitlement to Eleventh Amendment immunity in the single state context, as it is in the multistate context." *Gray v. Laws,* 51 F.3d 426, 432 (4th Cir.1995) (calling "protection of state treasuries and respect for the sovereign dignity of the states" the principal concerns or "twin reasons" underlying the Eleventh Amendment); *see also Hess v. Port Auth. Trans–Hudson Corp.,* —— U.S. ——, ——, 115 S.Ct. 394, 404, 130 L.Ed.2d 245 (1994) (acknowledging "vulnerability of the State's purse" as generally the "most salient" factor). If the "state's treasury will not be affected by a judgment in the action, then the availability of immunity for single state entities . . . must be determined by resort to the other relevant considerations referenced by the Court, chief among which are whether the suit will jeopardize 'the integrity retained by [the] State in our federal system,' *Hess,* 115 S.Ct. at 400, and whether the state possess such control over the entity claiming Eleventh Amendment immunity that it can legitimately be considered an 'arm of the State.'" *Gray,* 51 F.3d at 434.

■ Since the court holds today that an attempt to recover against a non-state entity's insurance policy that is maintained by the state in a fund that includes premiums paid by state agencies does *not* equate to an invasion of the state treasury for Eleventh Amendment purposes, it appears, under *Gray,* that the court should examine the other relevant considerations. The court actually believes the other considerations serve little purpose when the single state entity seeking immunity is simply a municipality (which is much less complex than, for instance, a single state ports authority) and when the only basis on which the municipality claims immunity is the monetary contribu-

tion to its insurer. Nevertheless, *Gray* states that the other considerations, identified for multistate entities in *Hess,* are "relevant even to the single state Eleventh Amendment inquiry." *Gray,* 51 F.3d at 433. At any rate, the other considerations weigh heavily against finding the City to be immune. A federal judgment against the City of Moncks Corner would have no impact upon the integrity of the state of South Carolina, because the City is virtually unconnected with the State other than paying its insurance premiums to state fund. Further, the state exercises no control over the City, which is independently incorporated and can in no way be considered an arm of the state.

Most courts faced with proposed Eleventh Amendment extensions have consistently held, through a variety of arguments, that municipalities are not protected. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 70, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989) ("States are protected by the Eleventh Amendment while municipalities are not."); *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 401, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401 (1979) (Eleventh Amendment does not "afford protection to political subdivisions such as counties and municipalities, even [where] such entities exercise a 'slice of state power.' "); *Monell v. Department of Social Servs.,* 436 U.S. 658, 690 n. 54, 98 S.Ct. 2018, 2035 n. 54, 56 L.Ed.2d 611 (1978) ("[T]here [is no] basis for concluding that the Eleventh Amendment is a bar to municipal liability."). Due to this court's concern about the unnecessary stretch of the Eleventh Amendment embodied in *Cromer* and because of crucial differences between the South Carolina Insurance Reserve Fund and the Commonwealth of Virginia's Public Official Liability Self–Insurance Plan in *Bockes,* this court declines Defendants' invitation to dismiss this case on Eleventh Amendment grounds.

### D. Lack of Municipal Liability

■ An official-capacity suit against an individual is really just another way of suing the government. *Brandon v. Holt,* 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). Here, Nelson has sued a city police officer

and the city, so the suit is construed as one against only the city. Municipal liability cannot be premised upon respondeat superior in § 1983 litigation. *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Rather, a plaintiff must show that a municipality itself has somehow violated federal rights. *Id.* The clearest way to make such a showing is when the municipality or one of its agencies has adopted an unconstitutional policy, ordinance, regulation or decision. No such policy is involved in this case. Absent a specific policy, liability must be premised upon a municipal "custom" or "usage" so prevalent that it is the equivalent of policy. *Id.* A single act or isolated incident does not provide causation sufficient to hold county or municipality liable on the basis of "custom" or "usage." *See Jordan v. Jackson,* 15 F.3d 333 (4th Cir.1994).

Plaintiff alleges that the City of Moncks Corner has a custom of inadequately training its officers for making "jailhouse arrests." There are two widely prevailing views regarding the imposition of municipal liability based on custom. First, a plaintiff may show that the government's need to train police officers in a certain area of the law is so obvious that a failure to do so would result in certain risk of violating the constitutional rights of its citizens. *See, e.g., Davis v. Mason County,* 927 F.2d 1473 (9th Cir. 1991); *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Berry v. City of Muskogee,* 900 F.2d 1489, 1497 (10th Cir.1990). Second, a plaintiff may show that if the need for training is not readily apparent, a pattern of constitutional violations has occurred constituting notice that there existed a deficiency in training. *See Cornfield v. Consolidated High Sch. Dist. No. 230,* 991 F.2d 1316, 1327 (7th Cir. 1993). Awareness on the part of the local government of such a deficiency is an essential element of this theory. *See Ruehman v. Village of Palos Park,* 842 F.Supp. 1043, 1058 (N.D.Ill.1993).

Here, Nelson has made no showing regarding similar past conduct on the part of the municipality. Therefore, in accordance with *Jordan* and *Canton,* this single incident

of alleged misconduct cannot be attributed to the City to impose municipal liability. Regarding Defendant Strawn, and as stated previously, a suit against the officer in his official capacity is essentially a suit against the city, and he likewise not liable. Therefore, Defendants are entitled to summary judgment in their favor.

## III.  MOTION FOR SANCTIONS, ATTORNEYS' FEES AND INJUNCTION

Defendants object to the magistrate judge's failure to address a defense Motion for Sanctions, Attorney's Fees, and Injunction signed June 29, 1993 and filed July 15, 1993. However, a review of the record reveals that Defendants' Motion was granted on October 6, 1993. The magistrate judge waited several months after Defendants' Motion was filed, and, not receiving any response from Nelson, the magistrate judge simply stamped the Motion with the notation "MOTION GRANTED." Evidently, defense counsel is unaware that the Motion was granted. Nelson was not unaware that the Motion was granted, however, as he filed "Plaintiff's Motion in Opposition to the Magistrate's Order Granting Defendant's Motion for Sanctions" on October 14, 1993.

In light of the fact that (1) Defendants were unaware of the resolution of this motion, (2) Nelson has "objected to" or "opposed" the magistrate judge's granting of the motion, and (3) the nature of the motion and the relief requested is such that some explanation of the decision is necessary to avoid ambiguity, this court will consider the merits of the motion as if it were on appeal from the magistrate judge's Order or as if the magistrate judge had merely issued a recommendation that the motion be granted.

The Fourth Circuit has upheld a district court's award of $42,378 in attorney's fees against a vexatious *pro se* litigant in accordance with Federal Rules of Civil Procedure 11. *See McMahon v. F & M Bank–Winchester,* 45 F.3d 426 (4th Cir.1994). The district court in *McMahon* also imposed a prefiling injunction which prohibited the plaintiff from filing any civil action in any federal court without leave of court. In affirming the dis-

trict court's injunction, the Fourth Circuit stated that "[f]ederal courts have the power and the obligation to protect themselves from abusive filing of frivolous and repetitive claims. Therefore, litigants 'can be severely restricted' in access to the courts...." *Id.*

At the time of the cross-motions in the case at hand, Nelson had eight cases pending or on appeal in the federal system.[7] Although one case proceeded to a trial on the merits, none have afforded Nelson any recovery. Because this particular motion is more than two years old and because it reached this court in a most unusual manner, this court will vacate the magistrate judge's grant of the motion and deny the motion. However, if Defendants still wish to pursue sanctions or a prefiling injunction, they are permitted 30 days from the date of this order to file an updated motion.

## IV. CONCLUSION

It is therefore,

ORDERED for the reasons articulated above, that Defendants' Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED; it is further

ORDERED that the magistrate judge's grant of Defendants' July 15, 1993 Motion for Sanctions, Attorneys Fees, and Injunction be VACATED; it is further

ORDERED that Defendants' July 15, 1993 Motion for Sanctions, Attorneys Fees, and Injunction be DENIED without prejudice to refile within 30 days of this Order.

**AND IT IS SO ORDERED.**

## NOTICE OF RIGHT TO APPEAL

Plaintiff is hereby notified that he has the right to appeal this order within thirty (30) days from the date hereof, pursuant to Fed. R.App.P. 3–4.

---

7. *Nelson v. Cannon et al.,* C.A. 91–0084–18AJ
*Nelson v. Taylor,* C.A. 92–3259–18AJ
*Nelson v. Strawn,* C.A. 93–0066–18AJ
*Nelson v. Dodson et al.,* C.A. 93–1855–18AJ
*Nelson v. Gorski et al.,* C.A. 94–0224–18AJ
*Nelson v. Berkeley County et al.,* C.A. 94–0713–18AJ
*Nelson v. Hopkins,* C.A. 94–2217–18AJ.