PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

AMY WEISCHEDEL CAMPBELL,
        *Plaintiff-Appellee,*

v.

GERALD GALLOWAY; STANLEY
KLINGENSCHMIDT,
        *Defendants-Appellants,*

and

THE TOWN OF SOUTHERN PINES;
SOUTHERN PINES POLICE DEPARTMENT;
OTHER UNNAMED EMPLOYEES OF THE
TOWN OF SOUTHERN PINES,
        *Defendants.*

No. 06-1038

NORTH CAROLINA LAW ENFORCEMENT
WOMEN'S ASSOCIATION; AMERICAN
CIVIL LIBERTIES UNION OF NORTH
CAROLINA LEGAL FOUNDATION,
INCORPORATED; NORTH CAROLINA
ACADEMY OF TRIAL LAWYERS,
        *Amici Supporting Appellee.*

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
Russell A. Eliason, Magistrate Judge.
(CA-03-892-1)

Argued: November 29, 2006

Decided: April 20, 2007

Before WILKINS, Chief Judge, and TRAXLER and
GREGORY, Circuit Judges.

Reversed and remanded in part; dismissed in part by published opinion. Judge Traxler wrote the opinion, in which Chief Judge Wilkins and Judge Gregory joined.

---

**COUNSEL**

**ARGUED:** Ann S. Estridge, CRANFILL, SUMNER & HARTZOG, L.L.P., Raleigh, North Carolina, for Appellants. Stephen Ashley Boyce, Winston-Salem, North Carolina, for Appellee. **ON BRIEF:** Norwood P. Blanchard, III, CRANFILL, SUMNER & HARTZOG, L.L.P., Wilmington, North Carolina, for Appellants. Lynn Fontana, Durham, North Carolina, for Amici Supporting Appellee.

---

**OPINION**

TRAXLER, Circuit Judge:

Amy Campbell sued the town of Southern Pines, North Carolina, and certain individual defendants after she was fired from her job as a police officer. Campbell raised Title VII discrimination and retaliation claims as well as various constitutional claims asserted under 42 U.S.C.A. § 1983 (West 2003). The magistrate judge granted summary judgment on some of Campbell's claims, but concluded that her Title VII claims against the town must proceed to the jury and that her First Amendment and Equal Protection claims against Gerald Galloway and Stanley Klingenschmidt (together, the "defendants") should likewise proceed to the jury. The defendants appeal, contending that they are entitled to qualified immunity on Campbell's constitutional claims.[1] As to the First Amendment claims, we agree that the defendants are entitled to qualified immunity, and we therefore reverse the decision of the magistrate judge in that regard. We dismiss as interlocutory the defendants' appeal of Campbell's Equal Protection claims.

---

[1]The Title VII claims that the magistrate judge allowed to proceed to the jury are not part of this appeal.

## I.

Amy Campbell was one of only a few female police officers in the Southern Pines, North Carolina, police department. She was hired on a probationary basis in May 2000. After completing the field training program, Campbell in December 2000 was assigned to work with one of the four teams within the patrol division. She was later transferred to the "Charlie" patrol team. The team lieutenant was Chris Burgess; next in command was Nick Polidori, the team sergeant.

There is evidence suggesting that Campbell was not well-liked by the other members of the Charlie team. For example, the team regularly had breakfast together at the end of a night shift, but Campbell claims that she was never invited; when a restaurant donated food to the department one night, the other team members ate it all without telling Campbell about it. Campbell attributed at least some of the problems to the fact that when she was a trainee, before she was assigned to Charlie team, she had reported Polidori for sleeping on the job.

In August 2001, Campbell met with Burgess (the team lieutenant) to talk about her performance. Burgess informed Campbell that he was going to write her up for missing an on-call day. Campbell protested, claiming that she handled the on-call day the way everyone else in the department did. Campbell then began voicing other complaints. She told Burgess that there was one set of rules for her and another for everyone else and that Polidori did not back her up during calls as he did the male officers. Burgess understood Campbell to be complaining about sexual harassment, and he reported the matter to Gerald Galloway, the Chief of Police. After consulting with the town's human resources officer and the town attorney, Galloway asked Campbell to provide him with a written report outlining her complaints.

Campbell turned in a thirteen-page memo setting out her complaints. Much of the memo focused on perceived slights, such as the team's failure to invite her to breakfast and Polidori's refusal to let her wash her patrol car while on duty. Some of the complaints, however, involved conduct that could be viewed as involving sexual harassment, such as complaints that officers made lewd comments in

her presence and made comments belittling women. The town investigated her complaints, although Campbell was not interviewed. The town concluded that some inappropriate conduct had occurred, but that the inappropriate conduct did not amount to sexual harassment. The town did, however, hold a sexual harassment seminar for the police department.

In December 2001, Campbell was transferred to a patrol team headed up by Klingenschmidt. It was Burgess, however, who completed Campbell's evaluation in February 2002. The evaluation gave Campbell a "needs improvement" rating in every individual category and "needs improvement" in her overall rating. "Needs improvement" is the lowest rating that can be given, and receiving that rating precludes an officer from receiving a pay increase. The evaluation recommended that the routine probationary period which Campbell began when she was promoted to Police Officer I be extended for sixty days. Chief Galloway and the town manager approved the evaluation.

Campbell believed that the evaluation was unfair, and she filed a grievance challenging it. Campbell arrived early for the March 12 grievance hearing and found Chief Galloway, Burgess, and Klingenschmidt meeting alone in Galloway's office. The meeting ended about an hour later and the three men then convened the grievance hearing. Campbell believed that the men had already decided the outcome of the hearing, and she refused to participate in the hearing except to ask that the grievance proceed to the next step in the process.

Campbell sent a letter to Chief Galloway the next day to set out her concerns about the grievance hearing. She complained that Klingenschmidt had raised his voice when she refused to discuss her grievance. She stated that she believed Klingenschmidt had threatened her when he called her a disgruntled employee and told her that he would be watching her for the next sixty days.

On March 18, 2002, Campbell filed an EEOC charge alleging gender discrimination and retaliation. Chief Galloway received a copy of the charge a few days later. On April 3, a second-step hearing on Campbell's grievance was held. Campbell asked that the matter proceed to the next step because Galloway did not render a decision at

the second-step hearing. Campbell was fired before the third-step hearing was held.

Campbell's firing came a few days after an incident that happened on April 4, 2002. That night, Klingenschmidt, Sergeant Tim Mercer, and Officer Jack Austin became involved in a high-speed chase with a truck driven by Carlton Terry. When Terry pulled into a parking lot and ran from his truck, Mercer began chasing him. Austin arrived on the scene, and he also began chasing Terry. Mercer stopped chasing when his flashlight quit working, but Austin was still chasing Terry. Campbell arrived on the scene in her patrol car, drove past Austin and around the block. Campbell contends that she did not see Terry but thought she saw someone going behind nearby houses and that she was trying to cut him off with the car. When Campbell stopped her patrol car, Austin came out from behind the houses where he was searching and asked for her flashlight, and together they looked for Terry.

There is some dispute about what happened next. In his deposition and affidavit, Austin says Terry was right in front of him when Campbell passed and that she could have caught him if she had gotten out of her patrol car. Austin was angry and thought that Campbell had left him exposed to danger by not joining in the foot chase. He complained to Mercer about Campbell not backing him up, and Mercer referred him to Klingenschmidt, who told Austin to write a memo. In his memo, Austin wrote that Campbell drove around the block to try to cut off the suspect. Mercer told him that he was speculating about why Campbell drove around the block, and he told Austin to remove that statement from his memo. Campbell and her husband (also a Southern Pines police officer), however, contend that Austin told them after the incident that Campbell had done nothing wrong and that Klingenschmidt and Mercer asked him for the memo. Austin told the Campbells that Klingenschmidt and Mercer had said that they were out to fire Campbell during her 60-day probation period.

After the April 4 incident, Klingenschmidt wrote a memo to Chief Galloway. In Klingenschmidt's view, the April incident was the last straw in a continuing course of unacceptable conduct. Klingenschmidt recounted in the memo two other incidents where he believed that Campbell had failed to back up other officers and left them in danger.

The first incident happened in October 2000, when Campbell was in training. She went on a domestic disturbance call with Sergeant Polidori and Officer Hogan. When Polidori attempted to arrest the suspect, the suspect became violent. According to Klingenschmidt, Campbell stood idly by while Polidori and Hogan struggled to subdue the suspect. The other incident happened in September 2001. Campbell passed a car that somewhat matched the description of a car driven by suspects in an armed burglary. She pulled in behind the car and waited for backup. While she was waiting, one of the occupants got out of the car and went towards the house. Just as Polidori arrived, the other occupant of the car got out and ran. Polidori went after the suspect on foot, and Campbell again drove around in her patrol car in an effort to cut off the suspect. She never told Polidori about the first occupant leaving the car. Lieutenant Burgess (then her immediate supervisor) talked to her about this incident at the time. He believed that she should have joined in the foot chase with Polidori and that leaving him to chase alone exposed him to the possibility of an ambush.

In his memo, Klingenschmidt recommended that Campbell be disciplined. Chief Galloway decided that Campbell's actions were putting other officers at risk and that she should be fired. Galloway knew that Campbell had filed an EEOC complaint and that she would add a claim of retaliatory termination, but he thought that it was too dangerous to leave her on the job. After conferring with the town attorney, Galloway fired Campbell.

As expected, Campbell added a termination claim to her EEOC complaint. After receiving her right-to-sue notice, she filed this action. In her complaint, she asserted Title VII claims of discrimination and retaliation. She also asserted constitutional claims under § 1983. Campbell claimed she was discriminated against because of her gender by being fired for doing the same thing that male officers did—using their patrol cars to try to cut off a suspect rather than joining in an ongoing foot chase. Campbell also contended that the defendants retaliated against her for filing the sexual harassment complaints by giving her a low evaluation and by firing her.

The magistrate judge granted summary judgment in favor of the town on Campbell's retaliation claim involving the February 2002

evaluation, but denied summary judgment to the town on the discriminatory and retaliatory discharge claims. As to Campbell's § 1983 claims, the magistrate read her complaint as raising a claim of discriminatory discharge in violation of her Equal Protection rights, as well as a claim that the individual defendants retaliated against her for exercising her First Amendment right to speak out about sexual harassment on the job. As to the Equal Protection claims against Galloway and Klingenschmidt, the magistrate judge concluded that summary judgment should be denied and that the claims should proceed to trial.

With regard to the First Amendment claims against the defendants, the magistrate judge concluded that Campbell's speech (the letter to Galloway) involved a matter of public concern (sexual harassment) and that it was for the jury to decide whether there was a sufficiently weighty reason to justify the termination. *See, e.g.*, *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968) (explaining that a state may not dismiss a public employee because of the employee's exercise of speech protected by the First Amendment); *Love-Lane v. Martin*, 355 F.3d 766, 776 (4th Cir. 2004) ("Retaliatory employment action violates a public employee's right to free speech" if the speech "relate[s] to a matter of public concern" and the "employee's interest in First Amendment expression . . . outweigh[s] the employer's interest in efficient operation of the workplace" (internal quotation marks omitted)). The magistrate judge rejected the defendants' claim that they were entitled to qualified immunity on the First Amendment claim.[2] Chief Galloway and Klingenschmidt appeal, arguing that the magistrate judge erred by denying them qualified immunity on Campbell's § 1983 claims.

II.

"In a suit against an officer for an alleged violation of a constitutional right, the requisites of a qualified immunity defense must be considered in proper sequence." *Saucier v. Katz*, 533 U.S. 194, 200 (2001). The threshold inquiry is whether the facts alleged, taken in the

---

[2]The magistrate judge addressed the qualified immunity question in a separate order, after the defendants filed a timely motion under Rule 59(e) of the Federal Rules of Civil Procedure.

light most favorable to Campbell, demonstrate the violation of a constitutional right. If so, then we must determine whether the contours of the right were clearly established such that a reasonable official would understand that his actions violated that right. *See id.*; *Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005).

### A.

We begin with Campbell's First Amendment claim. "It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 U.S. 378, 383 (1987). To determine whether a public employer's action against an employee violates the First Amendment, we must balance the employee's interest "as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Connick v. Myers*, 461 U.S. 138, 142 (1983) (internal quotation marks omitted). "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 126 S. Ct. 1951, 1960 (2006).

When balancing the competing interests of the public employer and employee, we must first determine whether the speech at issue may be "fairly characterized as constituting speech on a matter of public concern." *Id.* at 146. If the speech does involve a matter of public concern, then we must determine whether the employee's First Amendment interest "outweighs the public employer's interest in what the employer has determined to be the appropriate operation of the workplace." *Urofsky v. Gilmore*, 216 F.3d 401, 406 (4th Cir. 2000) (en banc).

The defendants argue that Campbell's speech was not a matter of public concern and that Campbell's termination therefore did not violate her First Amendment rights.[3] The defendants alternatively argue

---

[3]As noted above, the Supreme Court in *Garcetti v. Ceballos*, 126 S. Ct. 1951 (2006), held that speech made by a public employee pursuant to the

that it was not clearly established that Campbell's speech was a matter of public concern and that they are therefore entitled to qualified immunity on her First Amendment claims.[4]

(1)

"Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." *Kirby v. City of Elizabeth City*, 388 F.3d 440, 446 (4th Cir. 2004). "Personal grievances, complaints about conditions of employment, or expressions about other matters of personal interest do not constitute speech about matters of public concern that are protected by the First Amendment, but are matters more immediately concerned with the

---

employee's official duties is not protected by the First Amendment. The defendants on appeal do not contend that Campbell's speech was pursuant to her employment duties under *Garcetti*, and because *Garcetti* was decided after the proceedings below were completed, there is no factual basis upon which we could rest such a conclusion. In another case, the absence of factual record might require us to remand so that the record could be developed and the district court could reconsider the issues under the *Garcetti* framework. In this case, however, further factual development is unnecessary. As we will explain in more detail later, we conclude that the defendants are entitled to qualified immunity on Campbell's First Amendment claims. Our qualified immunity ruling would bar Campbell's claims even if her complaints were found to fall outside the scope of *Garcetti*, and a determination that her speech was pursuant to official duties would simply provide an additional basis for rejecting Campbell's First Amendment claims. Given these circumstances, we need not further consider the *Garcetti* issue, and we express no opinion as to how *Garcetti* would apply to facts similar to those in this case.

[4]We note that the defendants do not challenge the First Amendment claim on causation grounds. That is, they do not contend that summary judgment should have been granted because Campbell presented no evidence that her letter to Chief Galloway was a substantial factor in the decision to fire her. *See, e.g.*, *Love-Lane v. Martin*, 355 F.3d 766, 776 (4th Cir. 2004) (explaining that a First Amendment retaliation claim requires proof that the protected speech was a substantial factor in the decision to take the challenged retaliatory action). Nor do they contend that, even if causation were established, Campbell's letter was disruptive such that the Town's interest in the efficient operation of the police department outweighed Campbell's First Amendment interests.

self-interest of the speaker as employee." *Stroman v. Colleton County Sch. Dist.*, 981 F.2d 152, 156 (4th Cir. 1992). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48.

Of the many issues raised in Campbell's letter to Chief Galloway, the only issues that might qualify as matters of public concern are those raising questions of sexual harassment; the remaining issues are nothing more than personal complaints and grievances about conditions of employment that cannot be considered matters of public concern. *See Stroman*, 981 F.2d at 156. The defendants, however, argue that the sexual harassment complaints make up only a small portion of Campbell's thirteen-page letter and that the letter on the whole should be understood as raising only personal complaints. We disagree.

While we must view Campbell's letter "as a single expression of speech to be considered in its entirety," *id.* at 157, that does not give us license to ignore the portions of the letter raising issues of sexual harassment simply because most of the letter is devoted to personal grievances. In *Connick*, for example, the Supreme Court proceeded to the interest-balancing step of the analysis because one small portion of the speech at issue (a survey focusing on workplace morale and discipline) involved a matter of public concern. *See Connick*, 461 U.S. at 149 ("Because *one of the questions* in Myers' survey touched upon a matter of public concern, and contributed to her discharge[,] we must determine whether Connick was justified in discharging Myers." (emphasis added)). And in *Stroman*, we likewise treated as a matter of public concern a letter that was in large part a discussion of personal grievances but also mentioned a matter that could have been of public concern. *See Stroman*, 981 F.2d at 158 ("When speech arguably relates to a matter of public concern, we prefer to apply the approach taken in *Connick* and weigh *whatever* public interest commentary may be contained in the letter against the state's dual interest as a provider of public service and employer of persons hired to provide that service." (emphasis added)). Accordingly, Campbell's letter cannot be deemed to be a matter of private concern simply because the bulk of the letter addresses what can only be viewed as personal grievances.

The question, then, is whether Campbell's complaints about sexual harassment were a matter of public concern. While a complaint about sexual harassment certainly can amount to a matter of public concern, we have held that a complaint about sexual harassment or discrimination is not *always* a matter of public concern. *See Seemuller v. Fairfax County Sch. Bd.*, 878 F.2d 1578, 1582 n.4 (4th Cir. 1989) ("[N]ot every statement about discrimination based on sex involves a matter of public interest."). Other circuits have likewise rejected any claim that sexual harassment complaints are always matters of public concern. *See, e.g.*, *Azzaro v. County of Allegheny*, 110 F.3d 968, 980 (3d Cir. 1997) (en banc) ("[W]e do not suggest that all public employee complaints about sexual harassment are matters of public concern.").

In some circuits, the dispositive question appears to be whether the employee was complaining about a pattern of discrimination or was merely seeking redress for his or her own personal complaint. *See David v. City of Denver*, 101 F.3d 1344, 1356 (10th Cir. 1996) ("Officer David's complaints and letter allege that she has been personally subjected to sexual harassment, retaliation, and unwarranted disciplinary action. Her allegations focus on the conditions of her own employment, and . . . Officer David [does not] allege that other employees have been subjected to harassment or retaliation or that the harassment and retaliation has interfered with the Department's performance of its governmental responsibilities. Therefore, Officer David's statements do not involve matters of public concern under the *Connick* standard."); *Morgan v. Ford*, 6 F.3d 750, 755 (11th Cir. 1993) (concluding that employee's harassment complaint was not matter of public concern because the employee "was driven by her own entirely rational self-interest in improving the conditions of her employment. Her complaints about Ford's behavior, as serious as they were, centered around her private matters, not matters of social interest. As an employee grievance, Morgan's speech was not a matter of public concern."); *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 143 (2d Cir. 1993) ("Had Saulpaugh's complaints to her supervisors implicated system-wide discrimination they would have unquestionably involved a matter of public concern. Here, however, there has been no violation of the First Amendment, because Saulpaugh's complaints were personal in nature and generally related to her own situation." (citations and internal quotation marks omitted)); *Gray v. Lacke*, 885 F.2d 399, 411 (7th Cir. 1989) ("Gray complained to her

supervisors in order to have the sexual harassment stopped. Her communication related solely to the resolution of a personal problem. Therefore, this claim did not state an action under § 1983." (internal citation omitted)).

Not all circuits, however, find this distinction between claims of personal versus systemic discrimination to be dispositive of the public concern question. For example, in *Azzaro*, the Third Circuit found a complaint about sexual harassment to be a matter of public concern even though the employee was seeking relief only on her own personal complaint. *See Azzaro*, 110 F.3d at 978-79. And this court in *Beardsley v. Webb*, 30 F.3d 524 (4th Cir. 1994), concluded, albeit without discussion of the public concern issue, that a First Amendment retaliation claim of a public employee who complained about personal sexual harassment was properly submitted to the jury. *See id.* at 530-31.

Beyond recognizing that not every statement about sexual discrimination involves a matter of public concern, our cases have provided little concrete guidance on the question of when such a complaint amounts to an issue of public concern. We see no reason to try to articulate any sort of bright-line rule in this case, nor are we certain that a bright-line rule would be consistent with the Supreme Court's directive that we engage in a case- and fact-specific inquiry to determine "[w]hether an employee's speech addresses a matter of public concern," by considering "the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48. The case law from other circuits provides many examples of situations where a complaint of sexual harassment by a single employee is not a matter of public concern, but we can certainly envision situations where such a claim might well constitute a matter of public interest—for example, where a high-ranking public official is the offender. *Cf. Azzaro*, 110 F.3d at 978-79 (concluding that employee's complaint of sexual harassment by executive assistant to county commissioner was a matter of public concern). To conclude, as the defendants would have us do, that a personal complaint about discrimination affecting only the complaining employee can *never* amount to an issue of public concern could improperly limit the range of speech that is protected by the First Amendment. Accordingly, we believe it best to leave the law where we found it: Complaints of sex-

ual harassment are not *per se* matters of public concern; whether such complaints are in any given case depends on the content, form and context of the complaint. Applying that standard to this case and viewing the complaints in the light most favorable to Campbell, we conclude that Campbell's complaints about sexual discrimination do amount to matters of public concern.

Campbell complained about multiple instances of inappropriate conduct directed towards her. For example, while Campbell was in training, two officers while in her presence would "run up to each other and pretend to be having sex." J.A. 386. When Campbell was posing as a suspect during a training exercise, the gun she had tucked in her waistband fell down the front of her pants. Sergeant Polidori reached into Campbell's pants to retrieve the gun and then said, "'Guess I got the first feel on the new girl.'" J.A. 386. Campbell stated in the letter that other officers told her that Lieutenant Burgess regularly positioned himself so that he could look down Campbell's shirt. Campbell also complained that male officers did not back her up on dangerous calls, a complaint echoed by another female officer.

Campbell's letter also included complaints about inappropriate conduct directed towards other females. She complained about inappropriate conduct and comments by male officers in front of suspects and witnesses, as well as inappropriate conduct and comments by male officers directed at other female employees. For example, Lieutenant Burgess at a Christmas party said in front of Campbell and another female officer that "'[w]omen do not belong in law enforcement.'" J.A. 377. A discussion about scratches on the steering wheel of a patrol car degenerated into complaints about wives and women, with Lieutenant Burgess looking directly at a female trainee and saying, "'Isn't that just like . . . women. They mess with you at work and they mess with you [when] you're not at work.'" J.A. 388. Campbell recounted in the letter an incident where she and a male officer were at the home of a female "subject." The officers and several men and women were in the living room waiting for the subject when the male officer, watching a television program, commented about how much he enjoyed watching "'two girls running.'" J.A. 386. Campbell described another incident where Lieutenant Burgess escorted a female suspected of driving while intoxicated to the bathroom and required her to leave the door open so he could watch her, even

though Campbell had been in the room with the suspect and could have taken her to the bathroom.

In our view, these complaints, which involve improper treatment of members of the public as well as female officers, would be of genuine interest and concern to the public. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 247 (4th Cir. 1999) (explaining that whether a public employee's speech touches on a matter of public concern "rests on whether the public or the community is likely to be truly concerned with or interested in the particular expression, or whether it is more properly viewed as essentially a private matter between employer and employee" (internal quotation marks omitted)). It may be that the conduct about which Campbell complained would not be enough to support a hostile environment claim under Title VII. Nonetheless, the First Amendment protects statements by public employees on matters of public concern; its protection is not limited to complaints about conduct that is ultimately found to violate Title VII.

Moreover, we note that Campbell did not bring the sexual harassment issues to Chief Galloway's attention in order to resolve her own personal problem. She brought the issue up to Sergeant Burgess in the course of an apparently angry discussion about him writing her up for missing an on-call day; it was Burgess who took the matter to Chief Galloway. Although Campbell's memo to Galloway states that she had been discriminated against, the memo also speaks in much broader terms of "sexual harassment within your police department." J.A. 376. It thus appears that Campbell was seeking to challenge the practice within the department as much as she was seeking a resolution of her own complaint.

Accordingly, after considering the content, form, and context of Campbell's complaints in the light most favorable to her, we conclude that her complaints raise issues that would be of genuine concern to the public. *See Edwards*, 178 F.3d at 247. Campbell's complaints must therefore be viewed as touching on matters of public concern under *Connick*.

(2)

We turn now to the alternative argument made by the defendants—that even if Campbell's complaints were matters of public concern,

they are entitled to qualified immunity because the existing case law did not clearly establish that the kind of complaints that Campbell made were matters of public concern.

"Qualified immunity shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ridpath v. Board of Governors Marshall Univ.*, 447 F.3d 292, 306 (4th Cir. 2006) (internal quotation marks omitted). "A right is clearly established if the contours of the right are sufficiently clear so that a reasonable officer would have understood, under the circumstances at hand, that his behavior violated the right." *Bailey v. Kennedy*, 349 F.3d 731, 741 (4th Cir. 2003) (internal quotation marks and alteration omitted).

There is no doubt that the broad legal principle governing this case —that public employees may not be fired on a basis that infringes on their First Amendment rights— was clearly established at the time of Campbell's termination. At this stage of our analysis, however, our focus must be narrower, as the determination of whether a given right was clearly established requires us to define that right "at a high level of particularity." *Edwards*, 178 F.3d at 251. When the right is defined at the proper level of particularity and the analysis is directed to what is disputed in this case, the question becomes whether a reasonable officer would have known that Campbell's rambling thirteen-page memo to Chief Galloway, which focused overwhelmingly on personal grievances and vague gripes about fellow officers not being very nice to her, touched on a matter of public concern, thus entitling Campbell to the protection of the First Amendment. We answer that question in the negative.

"When determining whether a reasonable officer would have been aware of a constitutional right, we do not impose on the official a duty to sort out conflicting decisions or to resolve subtle or open issues." *McVey v. Stacy*, 157 F.3d 271, 277 (4th Cir. 1998). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Id.* (internal quotation marks omitted). As discussed above, this circuit has provided limited guidance on when complaints about sexual harassment will amount to matters of public concern.

We have noted that not all claims of discrimination amount to matters of public concern, *see Seemuller*, 878 F.2d at 1582 n.4, but we have also held that an employee's personal complaint about sexual harassment was enough to send the employee's First Amendment claim to the jury, *see Beardsley*, 30 F.3d at 530-31. Our fact-specific resolution of individual cases has done little to sharpen the line between cases where the complaints about discrimination are matters of public concern and those where such complaints are not matters of public concern.

In our view, the speech at issue in this case falls within the gray area between speech that clearly is a matter of public concern and speech that clearly is *not* a matter of public concern. Campbell's complaints overwhelmingly addressed purely personal grievances, and the portions of her letter mentioning improper sexual conduct and actions are not as clear and detailed as they could be. Although we have concluded that Campbell's complaints do touch on a matter of public concern, we reach that conclusion under a standard of review that requires us to view the evidence in the light most favorable to Campbell. And even under this favorable standard of review, the question is a close one. Under these circumstances, we cannot conclude that the defendants unreasonably viewed Campbell's letter as involving personal grievances only, particularly given the state of the law in other circuits. *Cf. Edwards*, 178 F.3d at 251 ("If a right is recognized in some other circuit, but not in this one, an official will ordinarily retain the immunity defense." (internal quotation marks and alteration omitted)). Because the facts of this case are close enough to the ill-defined line between private speech and speech involving matters of public concern, we cannot hold the defendants responsible for their reasonable but incorrect guess about how the law would apply to the facts of this case. *See Saucier*, 533 U.S. at 205 ("The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts. . . . If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.").

Accordingly, we conclude that the defendants are entitled to qualified immunity on Campbell's First Amendment claims. We therefore

reverse the magistrate judge's denial of summary judgment on that claim, and we remand with instructions to dismiss those claims.

## B.

We turn now to the defendants' contention that the magistrate judge erred by denying them summary judgment on Campbell's Equal Protection claim of discriminatory termination.[5]

The defendants contend that their motion should have been granted because they are entitled to an inference of non-discrimination under *Proud v. Stone*, 945 F.2d 796 (4th Cir. 1991), which held that a strong inference of non-discrimination arises in cases "where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring." *Id.* at 797. We lack jurisdiction to consider this claim.

We have jurisdiction to consider appeals from the denial of qualified immunity under the collateral order doctrine. "To the extent that the denial of qualified immunity rests on a question of law, the decision is 'final' pursuant to the collateral order doctrine." *Washington v. Wilmore*, 407 F.3d 274, 281 (4th Cir. 2005).

> Our appellate jurisdiction does not extend, however, to questions of evidence sufficiency, such as whether the plaintiff has offered sufficient evidence to create a genuine question of material fact. . . . In other words, we may review an official's contention that the facts alleged do not state a violation of clearly established law; we may not review the official's claim that the appellee failed to create a genuine issue of material fact with respect to whether the acts occurred as alleged.

---

[5]Campbell's Equal Protection claim mirrors her Title VII claim. Title VII does not provide the exclusive remedy for discrimination in employment, however, and public employees are entitled to bring a § 1983 action asserting Equal Protection claims. *See Booth v. Maryland*, 327 F.3d 377, 382 (4th Cir. 2003); *Beardsley v. Webb*, 30 F.3d 524, 526-27 (4th Cir. 1994).

*Id.* (internal quotation marks omitted). The defendants' *Proud v. Stone* argument is clearly one challenging the sufficiency of the evidence supporting Campbell's Equal Protection claim, and we therefore cannot consider it on appeal.

The defendants also contend that summary judgment should have been granted because in an affidavit, Campbell asserted that she was fired in retaliation for *complaining* about sexual harassment but did not assert that she was fired because of her gender. Because retaliation against a public employee for protected speech supports only a First Amendment claim, not an Equal Protection claim, *see Kirby*, 388 F.3d at 447, the defendants contend that her Equal Protection claim should have been dismissed.

In support of this contention, the defendants point to a few statements in an affidavit submitted by Campbell in which she states that she was fired for complaining about sexual harassment without mentioning her claim that she was fired for doing the same thing (using her patrol car to try to cut off a fleeing suspect) that male officers routinely did. In other portions of Campbell's affidavit and in her deposition, however, Campbell refers generally to the different set of rules that applied to the male officers, and in the affidavit relied upon by the defendants, Campbell specifically discusses the fact that male officers have used their patrol car to cut off a suspect who was being chased by another officer. Under these circumstances, we believe that this challenge by the defendants again amounts to a challenge to the sufficiency of the evidence supporting Campbell's Equal Protection claim, and we therefore conclude that we lack jurisdiction to consider the argument.

III.

Accordingly, for the foregoing reasons, we hereby reverse the magistrate judge's denial of summary judgment on Campbell's First Amendment claims, and we remand with instructions to dismiss those claims. Because we lack jurisdiction to consider the defendants' challenges to the denial of summary judgment on Campbell's Equal Protection claims, we dismiss that portion of the appeal.

*REVERSED AND REMANDED IN PART;*
*DISMISSED IN PART*