**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MELISSA H. TRAIL,

        *Plaintiff-Appellant,*

v.

LOCAL 2850 UAW UNITED DEFENSE
WORKERS OF AMERICA; UAW
REGION 8; THE INTERNATIONAL
UNION UNITED AUTOMOBILE
AEROSPACE AND AGRICULTURAL
IMPLEMENT WORKERS,

        *Defendants-Appellees.*

No. 12-1632

Appeal from the United States District Court
for the Western District of Virginia, at Abingdon.
James P. Jones, District Judge.
(1:11-cv-00058-JPJ-PMS)

Argued: January 31, 2013

Decided: March 21, 2013

Before WILKINSON, SHEDD, and DIAZ, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Shedd and Judge Diaz joined.

**COUNSEL**

**ARGUED:** Richard F. Hawkins, III, HAWKINS LAW FIRM, PC, Richmond, Virginia, for Appellant. Robert Edward Paul, ZWERDLING, PAUL, KAHN & WOLLY, PC, Washington, D.C., for Appellees. **ON BRIEF:** Jordan M. Kaplan, ZWERDLING, PAUL, KAHN & WOLLY, PC, Washington, D.C., for Appellees.

---

**OPINION**

WILKINSON, Circuit Judge:

While working for General Dynamics Armament and Technical Products, Melissa H. Trail belonged to a local affiliate of the United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW"). After being fired by General Dynamics, Trail sued the local affiliate, the UAW, and the UAW's regional office, alleging that two local union officials violated the Labor-Management Reporting and Disclosure Act (LMRDA) of 1959, Pub. L. No. 86-257, 73 Stat. 519 (codified as amended in scattered sections of 29 U.S.C.), by retaliating against her for reporting their supposed misconduct to the regional office. The district court dismissed Trail's complaint for failure to state a claim. While we think the district court ruled too broadly against the speech rights of union members under the Act, we shall nonetheless affirm its judgment on much narrower grounds.

I.

In reviewing the district court's decision to grant defendants' motion to dismiss Trail's complaint under Federal Rule of Civil Procedure 12(b)(6), "we accept the allegations of the

plaintiff's complaint as true." *Minor v. Bostwick Labs., Inc.*, 669 F.3d 428, 430 n.1 (4th Cir. 2012).*

A.

Trail worked for General Dynamics, a defense contractor, at its facility in Marion, Virginia, from 1989 until 1992, and again from 1995 until she was suspended, on March 26, 2009. Like all other hourly workers at the plant, Trail belonged to Local 2850 of UAW/United Defense Workers of America ("Local 2850" or "the Union"), an affiliate of the UAW within the jurisdiction of UAW Region 8 ("Region 8"). From 2004 to the summer of 2010, she also served as Local 2850's Recording Secretary, the Union's third-highest-ranking officer.

In April 2008, most of the Marion plant's unionized employees went on strike after the Union rejected a proposed collective bargaining agreement. At some point during the strike, someone posted lists of the names, salaries, and Social Security numbers of all of the facility's salaried employees on shacks that the striking workers had erected around the facility's perimeter. As part of its criminal investigation into this security breach, the Virginia State Police interviewed Trail. Although she denied any involvement in the episode, a Virginia grand jury indicted her, in March 2009, for felony identity theft, in violation of Va. Code Ann. § 18.2-186.3. General Dynamics suspended Trail's employment pending the outcome of the prosecution, noting that she could return to her job "in the event she is exonerated on all charges."

The Virginia prosecutor subsequently entered a *nolle*

---

*After entry of judgment, Trail asked for leave to file an amended complaint. We do not think the district court abused its discretion in denying that leave on the basis of futility. Moreover, even considering the allegations in the amended complaint, it would make no difference to the resolution of this case.

*prosequi* order dismissing the charges against Trail and informed her lawyer that the state would not refile them. General Dynamics, however, refused to let Trail return to work on the ground that the order allowed the prosecutor to reinstate the charges and that she thus had not been fully "exonerated." The company ultimately fired Trail in a letter dated September 15, 2009.

While still suspended from work, but before being fired, Trail had an encounter with two Local 2850 officials that gave rise to this suit. Specifically, on entering the Union office on August 13, 2009, she alleges that she saw the Union's then-president and vice president viewing pornographic images on a Union computer. Trail reported the incident to Region 8 representatives, but they declined to investigate. After she made this report, Trail alleges, the president and vice president began to retaliate against her in various ways. The vice president, for instance, criticized Trail at a meeting of the Union's executive board, sought to obtain a special parking pass at the Marion facility by falsely claiming that he had been threatened by Trail's husband, and told the management of General Dynamics that he believed that only thirty percent of the unionized employees wanted Trail to return to work. For his part, the president chastised Trail for reporting the pornography incident.

In addition, after General Dynamics fired Trail, the Union filed a grievance on her behalf to challenge her termination. Trail alleges that the president and vice president attempted to obstruct the grievance process by allowing it to be needlessly delayed, forbidding her to attend meetings with General Dynamics, prohibiting her from having her own legal representation, and holding meetings with a Union-designated legal representative in her absence. After Trail failed to have her termination overturned through the grievance process, she decided not to pursue the matter further through arbitration.

B.

Trail sued Local 2850, Region 8, and the UAW in U.S. District Court for the Western District of Virginia, alleging that Local 2850's president and vice president violated the Labor-Management Reporting and Disclosure Act (LMRDA) of 1959, Pub. L. No. 86-257, 73 Stat. 519 (codified as amended in scattered sections of 29 U.S.C.), by retaliating against her for reporting their putative misconduct to Region 8. As relevant here, section 101 of the LMRDA, part of the statute's "Bill of Rights of Members of Labor Organizations," guarantees a union member the following "free speech" rights against his union: "the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting." 29 U.S.C. § 411(a)(2). Section 102, in turn, provides a civil right of action to "[a]ny person whose rights secured by the provisions of th[e] subchapter [that includes section 101] have been infringed by any violation of this subchapter." *Id.* § 412. Finally, section 609 makes it "unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right" enshrined in the chapter containing section 101 and renders any violation of this guarantee actionable pursuant to the terms of section 102. *Id.* § 529.

After defendants moved to dismiss Trail's complaint, the district court held that the complaint failed to state a claim under any of these provisions. First, it explained that she could not state a claim under section 609 because that provision prohibits not "'ad hoc' retaliation by individual union officers," but only retaliation that is "the result of an established union disciplinary process," which Trail had not alleged. *Trail v. Local 2850, UAW/United Def. Workers*, 849

F. Supp. 2d 644, 647 (W.D. Va. 2012) (internal quotation marks omitted).

Second, in attempting to avoid section 609's "discipline" requirement, Trail had argued that section 101 creates a "free-standing" claim for nondisciplinary retaliation, which a plaintiff may then bring under section 102. But the district court declined to follow those circuits that have recognized such a claim, holding that section 609 provides the exclusive avenue for challenging retaliation by a union against a member who exercises her rights under section 101. *Id.* at 647-48.

Finally, the district court concluded that, even assuming the existence of a "freestanding" retaliation claim, Trail would still not be entitled to relief under the LMRDA, because her report to Region 8 was "not the type of 'view[ ], argument[ ], or opinion[ ]' in need of protection in order to promote union democracy"—the statute's primary purpose. *Id.* at 648 (alterations in original) (quoting 29 U.S.C. § 411(a)(2)). The district court accordingly granted the defendants' motion to dismiss under Rule 12(b)(6). *Id.* This appeal followed.

## II.

Trail argued before the district court, and again argues on appeal, that she need not allege that she was formally "discipline[d]" within the meaning of section 609 in order to state a retaliation claim under the LMRDA. Sections 101 and 102 of the statute, she says, together create a "freestanding" retaliation claim, completely independent of section 609's claim for retaliatory "discipline." The Supreme Court has indicated that there is a freestanding retaliation claim under sections 101 and 102. *See Sheet Metal Workers' Int'l Ass'n v. Lynn*, 488 U.S. 347, 353-55 & n.5 (1989); *Finnegan v. Leu*, 456 U.S. 431, 439 & n.10 (1982). This makes perfect sense, for Congress did not intend to provide union members an extensive list of free-speech rights only to then permit all sorts of retaliation against them so long as such retaliation fell short

of formal discipline. In this respect, therefore, the district court went too far in curtailing the free-speech rights of union members under the Act.

In the wake of the Court's decisions, the circuits have disagreed as to what precisely constitutes actionable retaliation under sections 101 and 102. *See, e.g.*, *Gilvin v. Fire*, 259 F.3d 749, 759 n.14 (D.C. Cir. 2001) ("[An elected union officer's] free speech claim depends only upon whether he can show retaliation against protected expression. He need not demonstrate any broader 'scheme.'"); *Maddalone v. Local 17, United Bhd. of Carpenters & Joiners*, 152 F.3d 178, 183-84 (2d Cir. 1998) (deeming actionable retaliation that either (1) "direct[ly] interfere[d] with union membership rights" or (2) "was part of [a] 'purposeful and deliberate attempt . . . to suppress dissent within the union'" (last alteration in original) (quoting *Schonfeld v. Penza*, 477 F.2d 899, 904 (2d Cir. 1973))). We need not, however, address what qualifies as actionable retaliation, because Trail's complaint falters over the threshold question of whether her allegations fell within the ambit of section 101 in the first place.

### III.

To state a retaliation claim under section 102 or section 609, a plaintiff must allege that the retaliation was in response to her exercise of a right guaranteed by some other provision of the LMRDA. *See* LMRDA § 102, 29 U.S.C. § 412 ("Any person whose rights *secured by the provisions of this subchapter* have been infringed by any violation *of this subchapter* may bring a civil action . . . ." (emphases added)); LMRDA § 609, 29 U.S.C. § 529 (making it unlawful to "discipline" someone "for exercising any right *to which he is entitled under the provisions of this subchapter*" (emphasis added)). Trail argues that, in reporting the pornography incident to Region 8 representatives, she exercised her "free speech" right under section 101(a)(2) "to express any views, arguments, or opinions." *Id.* § 411(a)(2).

A.

Although this court has yet to articulate a precise test for determining when a union member's speech falls within section 101(a)(2), the text and purpose of that provision lead us to hold that it protects speech that pertains to matters of union concern. The Supreme Court has declared the provision's purpose to be "to promote union democracy" by ensuring that "union members are free to discuss union policies and criticize the leadership without fear of reprisal." *United Steelworkers v. Sadlowski*, 457 U.S. 102, 112 (1982). Thus formulated, this purpose obviously "restate[s] a principal First Amendment value—the right to speak one's mind" without fear of retribution. *Id.* at 111. To be sure, section 101(a)(2) does not "incorporate[e] the entire body of First Amendment law." *Id.* at 109. But at the same time, because the provision "was patterned after the First Amendment," *Reed v. United Transp. Union*, 488 U.S. 319, 326 (1989), "First Amendment principles may be helpful, although they are not controlling," *Sadlowski*, 457 U.S. at 111.

In light of these pronouncements, the Eighth Circuit has analogized the section 101(a)(2) rights of union members to the First Amendment rights of government employees. *See Hylla v. Transp. Commc'ns Int'l Union*, 536 F.3d 911, 916-17 (8th Cir. 2008). Recently summarizing the latter body of doctrine, this court explained that the First Amendment protects a government employee's speech only when she "speak[s] as a citizen on matters of public concern." *Brooks v. Arthur*, 685 F.3d 367, 370 (4th Cir. 2012) (citing *Connick v. Myers*, 461 U.S. 138, 143 (1983)). This rule, the Eighth Circuit held, suggests an analogous one for LMRDA free-speech claims whereby "the threshold inquiry in the LMRDA context is whether the speech at issue may be fairly characterized as a matter of *union* concern"—that is, whether the speech "relates to the general interests of the union membership at large." *Hylla*, 536 F.3d at 917 (internal quotation marks omitted).

We agree with the Eighth Circuit that this test best effectuates section 101(a)(2)'s purpose of promoting union democracy. *See id.* at 917-18. For "a union's democratic governance will not be undermined" when a member suffers retaliation for having discussed a matter unrelated to general union policy and management. *Id.* at 917. We believe furthermore that the test follows directly from section 101(a)(2)'s text and structure. The phrase "views, arguments, or opinions" immediately follows the articulation of a union member's "right to meet and assemble freely with other members" and immediately precedes the articulation of his right "to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting." 29 U.S.C. § 411(a)(2). Though held by individual union members, both of these rights have a collective cast, contemplating the exchange of views about union policies among a union's membership. This statutory context demonstrates that in protecting the expression of "views, arguments, or opinions" by a union's members, Congress meant to facilitate discussion on matters not of idiosyncratic concern to any individual member, but of collective concern to all the members.

Not every issue that remotely relates to union affairs and governance, however, qualifies as a matter of union concern. Just as the First Amendment does not protect government employee speech that "touche[s] upon matters of public concern in only a most limited sense," *Connick v. Myers*, 461 U.S. 138, 154 (1983), so section 101(a)(2) does not protect union member speech that is of only limited significance to the union. In the government employment context, for instance, "[t]he mere fact that 'the public may always be interested in how government officers are performing their duties . . . will not always suffice to show a matter of public concern.'" *Brooks*, 685 F.3d at 372 (quoting *Borough of Duryea, Pa. v. Guarnieri*, 131 S. Ct. 2488, 2501 (2011)). The same holds true in the union context: a union official's every action does not become a matter of union concern simply because

members may always be interested in how officers spend every moment of their day. The test is whether the speech touches in some way the Act's overarching concern for union democracy, or whether it is of purely tangential import to union governance.

### B.

Trail insists that her report to Region 8 satisfies this test, since the report alleged misconduct by Local 2850's two highest-ranking officials. She equivocates about the precise nature of their wrongdoing, sometimes suggesting that it consisted of their viewing pornography per se, while at other times decrying the fact that they were "engaging in inappropriate *personal* activities *on Union time while being paid with Union dues*," Appellant's Reply Br. at 3. Ultimately, however, Trail contends that the president and vice president abused their offices either way, a matter of great concern to Local 2850's membership.

In determining whether a government employee's speech is on a matter of "public concern" for First Amendment purposes, courts "consider the 'content, form, and context of a given statement.'" *Brooks*, 685 F.3d at 371 (quoting *Connick*, 461 U.S. at 147-48). Considering these factors with respect to Trail's speech, we conclude that Trail did not speak on a matter of union concern when she reported the alleged pornography incident to Region 8.

The content of Trail's speech—that the president and vice president viewed pornography on a Union computer on a single occasion—was not a matter of union concern. As the district court rightly noted, "Trail does not allege that she . . . raised issues with respect to union policies," the kind of speech most "in need of protection in order to promote union democracy." *Trail*, 849 F. Supp. 2d at 648. Of course, Trail does contend that the president and vice president violated Local 2850's rules by engaging in personal activities while

they were supposed to be performing Union functions, but she does not claim to have voiced any substantive disagreement with the direction in which they were leading the Union. Nor does she allege that they ever committed other, more serious wrongdoing, such as embezzlement or corruption, or even the same wrongdoing on any other occasion. These omissions are telling, given that, as Local 2850's Recording Secretary, Trail was perhaps the member best positioned to uncover any other malfeasance.

To be sure, it would have been preferable for the Union officers to have been poring over the Union's books and finances at the precise moment Trail alleges that she happened upon them. But, alas, human imperfection must be kept in some perspective. The allegation in Trail's report to Region 8 reduces to a single instance of engaging in personal activities at work, an indiscretion that is anything but rare in the contemporary workplace, where employees regularly gossip around the water cooler, browse the latest news on the internet, and make personal phone calls. Were this enough to constitute a matter of union concern and thus to render her speech protected under section 101(a)(2), nearly every criticism by a union member regarding an official's conduct could be transmuted into a federal case—a result Congress could not possibly have intended in enacting the LMRDA.

Nor does the fact that the president's and vice president's wrongdoing involved pornography alter this analysis. Trail did not claim that their conduct was in any way illegal. She did not claim that it constituted the kind of "severe or pervasive" sexually harassing behavior sufficient to create a "hostile work environment" under Title VII. *Pa. State Police v. Suders*, 542 U.S. 129, 133 (2004). Had she made such allegations in her report to Region 8, the report might have stated a matter of union concern and thus might have been protected speech under section 101(a)(2). *See Campbell v. Galloway*, 483 F.3d 258, 268-70 (4th Cir. 2007) (considering when a government employee's report of sexual harassment consti-

tutes a matter of "public concern" and thus protected speech under the First Amendment). Instead, Trail reported behavior that was anything but admirable, and yet at the same time fell short of the concern with the formulation of union policies and functioning of union democratic mechanisms that lies at the heart of the Act. That the officers' activity was less benign than, say, playing solitaire or browsing a celebrity gossip blog is not by itself enough to elevate Trail's single allegation to a federal case.

The "form and context" of Trail's speech confirm our conclusion that her report to Region 8 did not involve a matter of union concern. The district court noted that "Trail does not allege that she made statements at a union membership meeting," but rather claims that she voiced her complaint through an informal union grievance process. *Trail*, 849 F. Supp. 2d at 648. We need not decide whether section 101(a)(2) protects such complaints, as opposed to statements made before the general union membership or at least a segment thereof. *See Brooks*, 685 F.3d at 371-72 (noting the Supreme Court's skepticism that the First Amendment protects petitions filed by government employees through internal grievance procedures). In light of the content of Trail's allegations against the president and vice president, the fact that she voiced them to the UAW's regional representatives rather than her fellow members of Local 2850 adds to the impression that she was not speaking on a matter of concern to Local 2850's general membership.

Our review of the "content, form, and context" of Trail's report to Region 8 also shows why the cases she cites are inapposite. She relies on this court's decision in *Kowaleviocz v. Local 333 of the International Longshoremen's Ass'n*, which held that a union member's profane criticism of a union officer was protected speech under section 101(a)(2) of the LMRDA. 942 F.2d 285, 290 (4th Cir. 1991). But whereas the member's criticism was part of "a history of opposition to certain official actions taken by" the officer, *id.*, Trail's report

was a one-off response to a one-off event involving union officers' personal conduct. Moreover, in *Kowaleviocz*, the member had voiced at least some of his criticisms at union meetings, leading this court to hold his speech to be protected under section 101(a)(2) not as a general "view[ ], argument[ ], or opinion[ ]," but more specifically as "an expression 'at meetings of the labor organization'" of a member's "'views . . . upon any business properly before the meeting.'" *Id.* (alteration in original) (quoting 29 U.S.C. § 411(a)(2)). Trail, of course, never alleges that she expressed her objections to any other member of Local 2850, let alone the membership as a whole. Finally, she cites a number of cases in which courts have held that allegations of official corruption in the use of public funds involve matters of public concern for First Amendment purposes. *See, e.g.*, *Robinson v. Balog*, 160 F.3d 183, 188-89 (4th Cir. 1998). But that is precisely the point: Trail never alleged malfeasance rising to such a level of seriousness.

## C.

Our holding should not be over-read. While at its core section 101(a)(2) covers speech in which union members "discuss union policies and criticize the leadership" regarding the general direction of the union, *Sadlowski*, 457 U.S. at 112, we do not suggest that the provision never protects a member's report of officers' malfeasance. To the contrary. For one thing, a single instance of wrongdoing might be sufficiently serious to affect a union's general affairs and thus to constitute a matter of union concern. If, for instance, a union member overheard officials plotting to rig a union election, section 101(a)(2) would protect her report of the incident, since it would concern a matter directly implicating union democracy. Trail's allegation, however, bears no resemblance to this.

The dangers of accepting Trail's allegation as actionable thus become apparent. Were we to do so, there would be no point of principled limitation to the number of LMRDA

claims that could be brought. As the Supreme Court has observed in the First Amendment context, "[t]o presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case." *Connick*, 461 U.S. at 149. We similarly cannot presume that all matters that transpire within a union office are of union concern, lest every allegation of every minor misstep by an official lay the groundwork for a federal suit. Moreover, many organizations have their share of rivalries and other assorted antagonisms. We cannot begin to sort out the obvious discord among the union officers in this case, other than to say that their various disputes are not ultimately actionable. The LMRDA seeks to safeguard union democracy, but it cannot aspire to monitor union officers' productivity in minute detail. Such judicial micromanagement would risk supplanting the very union democracy that the statute aims to maintain.

## IV.

Finally, section 609 makes it "unlawful for any labor organization or any officer . . . to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter." 29 U.S.C. § 529. Trail contends on appeal that, by retaliating against her for reporting the pornography incident to Region 8, Local 2850's president and vice president "discipline[d]" her within the meaning of section 609 for exercising her speech rights, as guaranteed by section 101.

We disagree. Trail not only fails to allege a right protected "under this chapter"; she has also failed to recognize that the term "discipline" in section 609 does not "include all acts that deter[ ] the exercise of rights protected under the LMRDA, but rather . . . denote[s] only punishment authorized by the union as a collective entity to enforce its rules." *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S.

67, 91 (1989). The term, in other words, "signif[ies] penalties applied by the union in its official capacity rather than ad hoc retaliation by individual union officers." *Id.* at 92 n.15. Thus, to state a claim under section 609, a plaintiff cannot allege simply that "he was the victim of the personal vendettas of . . . union officers"; rather, he must allege that he suffered "[t]he opprobrium of the union *as an entity*." *Id.* at 94. In particular, as the district court observed, the courts of appeals generally require plaintiffs to allege retaliation that was "the result of an established union disciplinary process." *Trail*, 849 F. Supp. 2d at 647 (internal quotation marks omitted).

None of the president's and vice president's alleged actions constituted "discipline," so defined. Instead, Trail has alleged various forms of "ad hoc retaliation" and "personal vendettas" by the two officers. This is obviously true in the case of the vice president's rebuke at the board meeting and his statements to General Dynamics regarding Trail's husband and her support among the unionized workers, as well as the president's reproach—none of which involved formal punishment "by the union as a collective entity" or "in its official capacity."

Nor were the president's and vice president's supposed attempts to subvert Trail's grievance process official punishment on the part of the Union as a whole. Although she was fired, an undoubtedly formal disciplinary action, Trail's own complaints make clear that that action was taken by General Dynamics alone, independently of the Union and its officers, in response to the identity-theft charges against her. She does not plausibly allege that the president and vice president, not to mention the Union as an entity, caused General Dynamics to fire her.

In short, Trail has issues with individual union officers. But she points to not a single action by the Union as a whole, let alone a Union action that was "the result of an established union disciplinary process." The district court thus did not err

in holding that she failed to state a claim under section 609 of the LMRDA.

V.

For the foregoing reasons, the judgment of the district court is affirmed.

*AFFIRMED*