**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 06-1960

SERENA C. MOSER,

Plaintiff - Appellant,

versus

MCC OUTDOOR, L.L.C.; SHIVERS TRADING &
OPERATING COMPANY,

Defendants - Appellees.

Appeal from the United States District Court for the Middle
District of North Carolina, at Durham. William L. Osteen, Senior
District Judge. (1:05-cv-00288-WLO)

Argued: September 25, 2007          Decided: December 5, 2007

Before TRAXLER, Circuit Judge, HAMILTON, Senior Circuit Judge, and
Robert J. CONRAD, Jr., Chief United States District Judge for the
Western District of North Carolina, sitting by designation.

Affirmed in part, reversed in part, and remanded by unpublished per
curiam opinion.

**ARGUED:** Stephen Ashley Boyce, Winston-Salem, North Carolina, for
Appellant. Mason Gardner Alexander, Jr., FISHER & PHILLIPS,
L.L.P., Charlotte, North Carolina, for Appellees. **ON BRIEF:**
Shannon Sumerell Spainhour, FISHER & PHILLIPS, L.L.P., Charlotte,
North Carolina, for Appellees.

Unpublished opinions are not binding precedent in this circuit

PER CURIAM:

Serena Moser appeals a district court order granting summary judgment against her in her action against MCC Outdoor, L.L.C. and Shivers Trading & Operating Company, alleging claims of hostile work environment and quid pro quo sexual harassment, termination in retaliation for her opposition to Title VII violations, and wrongful termination in violation of North Carolina public policy. We affirm in part, reverse in part, and remand for further proceedings.

## I.

Because this is an appeal from the grant of summary judgment, we view the facts in the light most favorable to Moser, the non-movant. See Saucier v. Katz, 533 U.S. 194, 201 (2001).

### A. General

Fairway Outdoor Advertising of the Triad in Greensboro, North Carolina, is a division of MCC Outdoor, L.L.C. and Shivers Trading and Operating Company (collectively, "Fairway"). Fairway hired Moser as a sales representative on July 9, 2003. Her responsibilities involved calling on potential customers and selling outdoor advertising space, such as billboard space. She was one of nine sales representatives in the Greensboro office, seven of whom were men. As a sales representative, Moser was required to report to the office for a short time at the beginning

and end of every day, but she otherwise spent her work time outside of the office. Moser and her fellow sales representatives operated in an open area with no partitions or walls. Her supervisor was sales manager Eddie Jones, who in turn reported to general manager Dan O'Shea.

Moser's time at Fairway was a rocky one. She had disputes with several Fairway employees, sometimes resulting in heated exchanges. Although Moser was on the receiving end of much objectionable behavior, she at times contributed to the less than professional atmosphere at Fairway. For example, she sometimes called other employees names, she joked that she was smarter than they were, and she once shot other employees with a water gun. On one occasion, she "dressed . . . [Jones] down" in front of O'Shea after a sales meeting in which she felt that she was being treated unfairly. J.A. 282. Another time, she was in Jones's office complaining about the behavior of another sales representative. When the meeting was not going as she had hoped, she told Jones, "You're getting on my nerves" and "walked off." J.A. 257 (internal quotation marks omitted). Moser received written warnings for both of these incidents.

B. Moser's Complaints Concerning Other Sales Representatives

Moser's primary antagonist in the office among the salesmen was George Wilkes. Moser and Wilkes were very competitive and often needled each other, leading to escalating conflicts that

3

sometimes required intervention and resulted in verbal reprimands. Even when the two were not openly hostile, Wilkes often irritated Moser. For example, he asked her about her personal life and tried to set her up with men; he commented that he thought she would have an affair with someone from the office; he once told her to slow down because she was "bouncing," J.A. 308 (internal quotation marks omitted); and once he made a comment about her backside. He smacked her on the bottom with a water bottle on one occasion. He also called her a "dingbat" and a "dumb blonde" after she had an accident while driving a company car. J.A. 242 (internal quotation marks omitted). Moser complained to O'Shea about Wilkes' behavior, specifically mentioning his popping her on the bottom with the bottle and a number of non-sexual comments he made to her. She lodged similar complaints about Wilkes to Jones.

Moser also had a few unpleasant interactions with sales representative Kelly Phipps, although she admits that she had no "real problem[]" with him. J.A. 322. On one occasion, Phipps asked her if she was gay. On another, Phipps told her that he felt like she dressed like a man, and he "went to touch [her] breast." J.A. 255. She rebuffed him, resulting in only his fingertips touching her. Another time, Phipps told Moser that he "would do" her. J.A. 321.

Although Moser identifies sales representative Tom Poe as a friend and the only person she felt "comfortable talking with" at

4

Fairway, J.A. 317, he also was guilty at times of acting unprofessionally toward her. For example, Poe once asked Moser if she was wearing a thong and if she had had sex with her then-current boyfriend. He suggested that she find someone with whom she could have casual sex. He said he himself would consider having sex with her if he were not married. Poe talked about another woman suffering from premenstrual syndrome and told Moser details of how he had sex with his wife. He also told her how female clients used to rub their breasts against him. One time Poe picked Moser up around the waist and carried her around, trying to "pull up [her] skirt." J.A. 309 (internal quotation marks omitted). Although Moser did not explain why she thought Poe did that, she testified that at the time she "didn't think [he] meant anything by it," and she soon "forgot about" the incident. J.A. 310. Moser admitted that she and Poe "did joke around." J.A. 312.

### C. Complaints Concerning Jones

Moser experienced far more serious problems with her supervisor, Jones. Jones once told Moser she was a "hottie," J.A. 295 (internal quotation marks omitted), and made a similar comment on another occasion. He once said to Wilkes (in front of Moser) that Moser seemed to come by Jones's house whenever Jones's wife was not around. Jones told Moser one time on a car trip that he "would do [her] in a heartbeat." J.A. 300 (internal quotation marks omitted). Another time, he said, "It's a good thing you work

5

out, because you don't have a boyfriend to have sex with." J.A. 306 (internal quotation marks omitted). He once showed her a pornographic picture of a little boy "with a very large penis" and told her that it was him when he was young. J.A. 301. When she told him that that was very inappropriate and pinched him, Jones told her that if she pinched him again, he would grab her breast.[1] He told her on one occasion that he liked small breasts, which she understood to refer to her. Finally, Jones once commented to another male employee, in front of Moser, "[W]e need to talk to Serena about different sexual techniques." J.A. 307 (internal quotation marks omitted).

Jones also talked to Moser on several occasions about how to tell how long a man's penis is and how he liked women's breasts and bottoms. In Moser's presence, Jones commented one time to Poe that he could help a particular woman with back problems by having sex with her "doggy-style." J.A. 286 (internal quotation marks omitted). On another occasion, he and Poe agreed in front of Moser that they "would do [a particular woman] in a heartbeat." J.A. 287.

One day, before an upcoming conference, Jones told Moser to "bring a bikini [because] there's a hot tub at the hotel we can

_____

[1]Moser testified to this fact in her deposition, but shortly before, in the same deposition, she had testified that Jones had threatened to "grab [her] butt" rather than her breast. J.A. 151 (internal quotation marks omitted).

6

use." J.A. 293 (internal quotation marks omitted). He also told Moser that he "care[d] for" her and that he otherwise would have fired her for inappropriate behavior. J.A. 270, 300 (internal quotation marks omitted). One time when Moser and Jones were trying to resolve a disagreement, Jones "just threw his hands and arms up into the air and said, 'But, Serena, I love you.'" J.A. 303. He used to ask Moser what she was cooking for dinner and would say that he would not come over if she was not making something he liked. Once when Moser told him that she would like to get married within five years, he told her that he would be divorced within that time frame.

Unfortunately, Jones's unwelcome conduct toward Moser was not limited to the verbal. One day when Jones was driving Moser and some others in his car—Moser and Jones were in the front seat—Jones placed his hand on Moser's left thigh at least three times, each time for "a couple of minutes" until Moser squirmed away from him. J.A. 285. Jones once slid his arm around Moser's waist at an after-work-hours reception, causing Moser to "f[a]ll back into a crowd of people" as she tried to extricate herself. J.A. 236. Moser recalled two times when Jones hugged her from the side, squeezing her shoulder. At least two times, Jones hugged Moser after they had gone together to the YMCA to work out. And, one evening when the two were at a bar with friends, Jones hugged her and kissed her head when she left. Jones also "would eyeball

7

[Moser] up and down constantly," J.A. 268, and looked down Moser's blouse on several occasions, often forcing her to cover herself when she sensed Jones was in position to look.

Moser often objected to Jones's sexual comments and actions when they occurred. As a result, Jones became increasingly hostile toward her and repeatedly expressed concern to Moser that she was going to claim that he had sexually harassed her. Moser described the uncomfortable pattern that developed:

> [Jones] would make some kind of sexual advance toward me and I would say no or I would confront him on it to get him to understand it makes me uncomfortable per his request and he would get really mad and start yelling. Then, later on, he would be real nice and make some other advance toward me and the whole cycle would start over again.

J.A. 386.

One of the most upsetting incidents with Jones occurred just 12 days before Moser was fired. On the day in question, Jones called Moser into his office after a sales meeting. He opened the door only a couple of feet and when she walked in he "cornered" her, "came right up on [her] person," "pushed [her] behind the back of the door," "look[ed] down [her] blouse," and shut the door. J.A. 266, 294. As he backed away from her and began to sit down in a chair, he said, "Serena, what do we need to do to get our relationship back on track?" J.A. 266 (internal quotation marks omitted). The incident ended when she said that she did not know what they should do. Moser also described another bizarre event

8

in which Jones "walked up to [her] and just yanked [her] out of [her] chair." J.A. 386.

As a result of the mistreatment she received, many times in front of other Fairway employees, Moser felt she "had to work ten times harder to earn people's respect." J.A. 356. As the abuse began to escalate in January and February of 2004, she became very anxious. The stress prevented her from sleeping, which, in turn, affected her work performance. She became frustrated and depressed and eventually consulted with a counselor to help her "deal with the offensive behaviors at Fairway." J.A. 396.

### D. Moser's Termination

According to Fairway's answers to interrogatories produced as discovery in the present case, general manager O'Shea decided to terminate Moser in late June 2004, effective immediately, because of what Fairway contends were "constant conflicts with other staff members that were instigated by [Moser], her condemnation of management, her disruptive disposition, her failure and refusal to cooperate with others and her rude, arrogant and condescending treatment of others." J.A. 652. Moser was called into O'Shea's office, where Jones told her the news, and O'Shea told Moser, "I back up [Jones]." J.A. 273 (internal quotation marks omitted). When Moser asked why she was being let go, both men told her that she no longer appeared happy to work at Fairway and no longer fit in.

9

E.  Moser's Lawsuit

Moser brought this action against Fairway in the district court, alleging violations of Title VII of the Civil Rights Act of 1964, namely, quid pro quo and hostile environment sexual harassment, retaliatory discharge based on Moser's complaints of sexual harassment, and discriminatory discharge based on her gender.  She also alleged a state law claim for wrongful termination in violation of North Carolina public policy.  The district court granted summary judgment in favor of Fairway on all claims.  The court disposed of the quid pro quo and discriminatory discharge claims on the ground that Moser failed to properly contest Fairway's motion with regard to those claims under the court's local rules.  As for the hostile environment claim, the court determined that the forecasted evidence was insufficient to create a prima facie case because it could not support a reasonable inference that the unwelcome sexual conduct was sufficiently severe or pervasive to alter the terms of her employment.  Regarding retaliation, the district court noted that Moser relied only on her alleged complaints about Wilkes's behavior to show that she had engaged in protected conduct, but she failed to forecast evidence that her complaints about Wilkes covered sexual or gender-based harassment.  Finally, the court ruled that Moser's violation of North Carolina public policy claim failed because Moser did not point to evidence tending to show that Jones continually made

10

sexual advances toward her and because the court was not aware of any such evidence.

## II.

Moser first argues that the district court erred in ruling that the evidence she forecasted was insufficient to create a prima facie case of hostile environment sexual harassment. We agree there is sufficient evidence to warrant a jury trial on this issue.

We review a district court's grant of summary judgment de novo, viewing any facts and inferences drawn from them in the light most favorable to Moser, the non-moving party. See Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 958 (4th Cir. 1996). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Title VII of the Civil Rights Act of 1964 prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C.A. § 2000e-2(a)(1). This prohibition "not only covers 'terms' and 'conditions' in the narrow contractual sense, but evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment." Oncale v. Sundowner

11

Offshore Servs., Inc., 523 U.S. 75, 78 (1998) (internal quotation marks omitted).  Thus, it is a violation of Title VII to maintain a sexually hostile work environment, i.e. a "workplace . . . permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotation marks & citation omitted). To establish a hostile environment sexual harassment claim, a plaintiff must show conduct that "(1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer."  Ocheltree v. Scollon Productions, Inc., 335 F.3d 325, 331 (4th Cir. 2003) (en banc).

The district court determined that the evidence was insufficient to create a genuine issue of material fact regarding the third element.  In deciding as a matter of law whether harassment was sufficiently severe or pervasive to bring it within Title VII's purview, we must examine the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23.  This standard is designed to "filter out

12

complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal quotation marks omitted). "Unlike other, more direct and discrete unlawful employment practices, hostile work environments generally result only after an accumulation of discrete instances of harassment." Jordan v. Alternative Resources Corp., 458 F.3d 332, 339 (4th Cir. 2006), cert. denied, 127 S. Ct. 2036 (2007). "Harassment reaches the sufficiently severe or pervasive level when it creates 'an environment that a reasonable person would find hostile or abusive' and that the victim herself 'subjectively perceive[s] . . . to be abusive.'" Jennings v. Univ. of N.C., 482 F.3d 686, 696 (4th Cir. 2007) (en banc) (quoting Harris, 510 U.S. at 21), cert. denied, 2007 WL 2010134 (U.S. Oct. 1, 2007). In this case, Moser clearly forecasted sufficient evidence that she perceived her work environment to be abusive. The issue on which we focus is whether this evidence created a genuine issue of material fact regarding whether Moser's perception was reasonable.

We have recognized "that the line between a merely unpleasant working environment and a hostile or deeply repugnant one" is sometimes difficult to locate. Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753 (4th Cir. 1996) (internal quotation marks & alteration omitted). While this case demonstrates just how

13

difficult placing that line can be, we nonetheless conclude that the district court erred in granting summary judgment on Moser's hostile environment claim.

Even without taking into account the conduct of Moser's fellow sales representatives, a reasonable jury could determine that Jones constantly made Moser reasonably feel that she was his sexual prey. By telling Moser that she was a hottie, that he would like to see her in a bikini, or that he "would do [her] in a heartbeat," J.A. 300, Jones communicated to Moser that he wanted to have sex with her. Furthermore, the record, viewed in the light most favorable to Moser, showed that Jones regularly took opportunities to treat her in a sexual way. He slipped his arm around her waist, hugged her, repeatedly placed his hand on her thigh during a car trip, and "eyeball[ed] [Moser] up and down constantly." J.A. 268 (emphasis added). He also repeatedly sought to look down her blouse.

Although not quite as severe, many of Jones's other actions could be found by a reasonable jury to have contributed to the pervasiveness of the unwanted sexual conduct. Such a jury could find that many statements or actions that Moser otherwise might have perceived as simply boorish or inappropriate under other circumstances reasonably were humiliating to her in light of the sexually predatory relationship Jones had developed with her. For example, Jones's subjecting Moser to his general comments about what parts of the female anatomy he enjoyed and what sex acts he

14

would like to perform on other women could reasonably be expected to make Moser much more uncomfortable because she knew that he was interested in <u>her</u> body specifically and would like to perform the same acts <u>on her</u>.  See <u>Jennings</u>, 482 F.3d at 698 (concluding that a jury could reasonably find that two incidents of direct harassment of the plaintiff "were more abusive in light of the general, sexually charged environment" created by other inappropriate sexual conduct); <u>see also</u> <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 115 (2002) ("Hostile environment claims are different in kind from discrete acts.  Their very nature involves repeated conduct. . . .  Such claims are based on the cumulative effect of individual acts.").  Similarly, Jones's showing Moser a pornographic picture, talking about male sex organs, noting that Moser did not have anyone to have sex with, and saying that he and another employee needed to talk to Moser about sexual techniques could reasonably have made Moser extremely uncomfortable for the same reason.  And, Jones's telling Moser that he cared for her or loved her and suggesting that he would like to come over to her house also reasonably could be viewed as reiterations of the sexual desire for Moser that Jones had already expressed.

Indeed, the fact that Moser was a specific object of Jones's sexual attention and not just a witness to inappropriate sexual behavior concerning other women makes much of the conduct that

15

Moser allegedly endured arguably more severe--more humiliating in an objective sense--than the conduct we found sufficient to support a plaintiff's verdict in Ocheltree. In Ocheltree, a female employee was subjected every day to graphic sexual talk from her male coworkers, including descriptions that often portrayed women in a "sexually subservient and demeaning light." Ocheltree, 335 F.3d at 333. She was once sung a vulgar song that arguably used her as the subject, and "something sexual" was done to a mannequin anytime Ocheltree walked by. Id. at 328, 332 (internal quotation marks omitted). Here, in contrast, it was Moser's own body that her supervisor was "constantly" "eyeballing" "up and down"-- particularly when Jones was able to look down her blouse. And while the coworkers in Ocheltree discussed having sex with their wives and girlfriends, Jones told Moser that he wanted to have sex with her and stated that he and another employee should talk to her about different sexual techniques. While the male employees at Ocheltree touched a mannequin in sexual ways in front of the plaintiff, Jones actually touched Moser--in the most egregious examples, by placing his hand on her thigh several times during a car trip as she squirmed away to avoid his touch and by pushing her behind a door in his office and looking down her blouse.

Moreover, in our view, the evidence forecasted of Jones's sexual conduct was substantially different from that in Weiss v. Coca-Cola Bottling Co. of Chicago., 990 F.2d 333 (7th Cir. 1993),

16

on which the district court relied. There, the plaintiff's supervisor "asked her for dates, called her a 'dumb blond,' put his hand on her shoulder several times, placed 'I love you' signs in her work area [during one week] and attempted to kiss her in a bar." Id. at 337.[2] The Seventh Circuit concluded that the district court had properly granted summary judgment because the incidents were "relatively isolated" and not sufficiently serious considering their infrequency. Id. Here, in contrast, Moser forecasted evidence that, viewed in the light most favorable to her, showed that Jones's abuse was relentless. And, it is important to emphasize that all of the numerous incidents Moser described occurred during Moser's less-than-a-year tenure at Fairway. Cf. Hopkins, 77 F.3d at 753-54 (holding that male supervisor's alleged harassment of male employee, including bumping into employee, positioning magnifying glass over his crotch, giving him a congratulatory kiss at his wedding, staring at him in the bathroom, commenting on his appearance, and making inappropriate sexual comments, was not sufficiently severe or pervasive when the alleged incidents occurred only intermittently over a seven-year period).

In holding that the forecasted evidence here was sufficient, we emphasize that a reasonable jury could infer from the evidence

---

[2]The supervisor "also may have twice attempted to kiss her in the office, though [the plaintiff's] deposition testimony [was] contradictory on th[at] point." Id.

17

that the hostility that Jones developed toward Moser when she repeatedly objected to his sexual behavior further interfered with her opportunity to have an effective working relationship with her supervisor and contributed heavily to the abusiveness of the working environment. The cycle Moser described of Jones engaging in sexually inappropriate conduct toward her and then lashing out at her as she attempted to distance herself from him left Moser in an impossible situation. In this respect, the evidence in this case resembles that of Beardsley v. Webb, 30 F.3d 524 (4th Cir. 1994). There, the plaintiff, a second lieutenant in the sheriff's office, alleged that her supervisor harassed her for a five-month period, thereby prompting her resignation. The alleged harassment included the supervisor calling the plaintiff "honey" and "dear" in front of subordinates; standing behind the plaintiff during roll call and touching her shoulders; and, following the plaintiff's complaint that this made her and her husband (also a member of the sheriff's department) uncomfortable, massaging the plaintiff's shoulders while staring at her husband. It also included unjustifiably accusing her of having an affair with a deputy, asking her what kind of underwear she wore and what type of birth control she used, and ordering her to drive him to pick up his car from a repair shop and stating that "it was his turn to make out in the parking lot" with her. Id. at 528 (internal quotation marks omitted). After the plaintiff complained, she was given the "cold

18

shoulder" by her supervisor and her relationship with the deputies suddenly soured. Id. The court rejected the defendant's argument that the plaintiff's evidence was not substantial enough to require submission to the jury of the question of whether the supervisor's discriminatory conduct was sufficiently severe and pervasive to make out a sexual harassment claim, stating that: "In combination, his acts altered the condition of [the plaintiff's] employment and created an objectively abusive work environment." Id. at 529. We conclude that the same is true here.

In sum, a jury could reasonably conclude from the evidence forecasted that Jones was unyielding in his sexual treatment of Moser, crippling her ability to have a healthy working relationship with him, and causing her significant personal anguish as she attempted to avoid his sexual behavior and deal with the antagonism he directed toward her. On this basis, a rational jury could conclude that Moser reasonably found her working environment to be both hostile and abusive such that the terms of her employment were altered. We therefore reverse the grant of summary judgment on Moser's hostile environment claim.


III.

Moser next maintains that the district court erred in granting summary judgment against her on her quid pro quo sexual harassment claim. We disagree.

19

Although quid pro quo and hostile environment sexual harassment claims both arise under Title VII, each type of claim requires proof of an element that the other does not. To wit, to establish quid pro quo liability, a plaintiff must prove "that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753 (1998). In contrast, to establish a hostile environment claim, the plaintiff must prove that the objectionable conduct was "severe or pervasive." Id. at 754.

In Moser's quid pro quo claim asserted in her complaint, Moser alleged that her "express rejection of [Jones's] demands for sexual favors caused her termination." J.A. 19. The district court granted summary judgment against Moser on this claim (as well as on her discriminatory discharge claim), stating:

> Under these facts, the court considers summary judgment on those claims to be uncontested. See L.R. 7.3(k), L.R. 56.1(e). Because Defendants' uncontested argument appears to be reasonable, summary judgment on those grounds will be granted.

J.A. 42.[3] "We review the district court's application of its local rules for an abuse of discretion." See Northwest Bank & Tr. v. First Ill. Nat'l Bank, 354 F.3d 721, 725 (8th Cir. 2003).

Middle District of North Carolina Local Rule 7.3(k) provides:

> The failure to file a brief or response within the time specified in this rule shall constitute a waiver of the

---

[3]Moser does not challenge the district court's ruling regarding her claim of discriminatory discharge.

20

right thereafter to file such brief or response, except upon a showing of excusable neglect. A motion unaccompanied by a required brief may, in the discretion of the court, be summarily denied. A response unaccompanied by a required brief may, in the discretion of the court, be disregarded and the pending motion may be considered and decided as an uncontested motion. If a respondent fails to file a response within the time required by this rule, the motion will be considered and decided as an uncontested motion, and ordinarily will be granted without further notice.

M.D.N.C. Local Rule 7.3(k). Middle District of North Carolina Local Rule 56.1(e) states:

In a responsive brief the party having made the challenged claim may, within 30 days after service of the summary judgment motion and brief, file with the court a response that sets out the statements required by LR7.2(a)(1)-(3) and also sets out the elements that it must prove (with citations to supporting authority), and the specific, authenticated facts existing in the record or set forth in accompanying affidavits that would be sufficient to support a jury finding of the existence of the disputed elements. The failure to file a response may cause the court to find that the motion is uncontested.

M.D.N.C. Local Rule 56.1(e).

We find no abuse of discretion in the district court's application of its local rules. Moser's brief to the district court argued that Moser had presented a prima facie case of sexual harassment amounting to a hostile work environment. The brief then proceeded to present facts that Moser contended demonstrated that the harassment was sufficiently severe or pervasive to impose liability. It included no mention of quid pro quo liability or the elements that would establish such liability, and it did not identify any issue of material fact concerning those elements.

21

Especially considering that Moser's brief did not assert that she could prove sexual harassment liability if the harassment were not sufficiently severe or pervasive to create a jury issue on hostile environment, the district court's application of its local rules was reasonable.

IV.

Moser next contends that the district court erred in granting summary judgment against her on her illegal retaliation claim. We disagree.

The relevant portion of Title VII provides: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C.A. § 2000e-3(a). Moser sought to establish her Title VII retaliation claim under the well-known McDonnell-Douglas burden-shifting proof scheme. See McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). A plaintiff establishes a prima facie case of retaliation under this scheme when she presents evidence that 1) she was engaged in a protected activity, 2) she was subjected to an adverse employment action, and 3) there was a causal link between the two.[4] See Beall v. Abbot Labs., 130 F.3d

---

[4]When a plaintiff makes such a showing, the burden then shifts to the employer to rebut the presumption of retaliation by articulating a legitimate nonretaliatory explanation for its actions. See Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994).

614, 619 (4th Cir. 1997).  In order to satisfy the first element, a plaintiff must proffer sufficient evidence that she had an objectively reasonable belief that she was complaining of conduct that constituted a Title VII violation.  See Jordan, 458 F.3d at 340-41.

In granting summary judgment against Moser on this claim, the district court concluded that Moser had failed to create a genuine issue of material fact regarding whether she engaged in a protected activity.  The court rejected Moser's claim that she "complained to her employer about unlawful harassment" because the complaints she relied on as constituting protected activity--"complaints about Wilkes"--did not concern conduct that could reasonably believed to be prohibited by Title VII because it was mostly unrelated to gender.  J.A. 48.

Although Moser maintains that she in fact forecasted evidence that she engaged in protected activity, she does not directly challenge the district court's ruling that she failed to create a genuine factual issue regarding whether she reasonably believed that the conduct of Wilkes about which she complained violated Title VII.  Moser now argues that she forecasted evidence of complaints about Jones's conduct that a jury could reasonably find

The plaintiff then must prove that the offered explanation is false and that retaliation was the actual reason for the adverse action. See Jiminez v. Mary Washington College, 57 F.3d 369, 377-78 (4th Cir. 1995).

23

constituted conduct protected under Title VII. In so doing, she does not so much as acknowledge--let alone challenge--the district court's determination that, in opposing Appellees' summary judgment motion on her retaliation claim, Moser relied exclusively on her complaints about Wilkes. We need not address the issue of whether Moser forecasted evidence of the record of her complaints of conduct of people other than Wilkes in light of the district court's unchallenged determination that she did not present that legal theory in the district court. See Muth v. United States, 1 F.3d 246, 250 (4th Cir. 1993) (refusing to reverse summary judgment on the basis of an issue raised for the first time on appeal). We therefore affirm the grant of summary judgment on Moser's retaliation claim.

V.

Moser finally argues that the district court erred in granting summary judgment against her on her state law claim that she was terminated in violation of North Carolina public policy since she was fired for refusing the sexual advances of her supervisor. The district court ruled against Moser on the basis that she did not highlight any forecasted evidence in support of her claim that Jones continually made sexual advances toward her and the court was not aware of any such evidence. Moser now argues that she forecasted evidence sufficient to create a genuine issue of material fact regarding whether Jones implicitly conditioned

24

Moser's employment upon her consenting to have sex with him. We disagree.

Although North Carolina employees are generally terminable at will, an exception exists for discharges made in contravention of North Carolina public policy. See Coman v. Thomas Mfg. Co., 381 S.E.2d 445, 447 (N.C. 1989). We have held that "[w]hatever the breadth of the Coman exception, it most definitely includes firings resulting from an employee's refusal to follow his employer's instructions to violate the law." Harrison v. Edison Bros. Apparel Stores, Inc., 924 F.2d 530, 534 (4th Cir. 1991). Reasoning that a supervisor's requiring an employee to have sex with him in order to retain her job would amount to requiring her to commit prostitution, we have held that terminating an employee for refusing such demands constitutes a wrongful termination in violation of North Carolina public policy. See id.

We, like the district court, see no evidence that Jones conditioned Moser's continuing employment on her consent to have sex with him. Jones's constant lechery (and eventual hostility) may well have ruined any opportunity Moser had to have a successful working relationship with him and caused Moser tremendous anguish in the process. However, Moser did not forecast any evidence that he sought to require her to have sex with him or even evidence that he asked her to have sex. The closest she came in that regard would have been her testimony concerning an incident in which Jones

25

pushed her behind the back of his office door before backing up and asking, "Serena, what do we need to do to get our relationship back on track?" J.A. 266. We conclude that it would be simply too big a leap for a jury to be able to reasonably find that with that question he was asking her for some sort of sexual favor. In this regard, it is important to emphasize that there was no evidence that Jones had ever actually asked Moser for sex before; that at the time of the incident she did not believe he was asking for sex; and that when she responded that she did not know what they could do to improve their relationship, he gave no indication that he was suggesting anything sexual. On these facts, any finding that Jones actually propositioned Moser could only be based on rank speculation. We therefore conclude that the district court correctly granted summary judgment on this cause of action. See Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party . . . cannot create a genuine issue of material fact through mere speculation.").

VI.

In sum, because we conclude that Moser forecasted evidence sufficient to create a genuine issue of material fact regarding whether the sexual conduct she complained of was sufficiently severe or pervasive to create a hostile environment, we reverse the district court's grant of summary judgment on that claim, and we

26

remand to the district court for further proceedings.  Finding no other error, we otherwise affirm.

<u>AFFIRMED IN PART,</u>
<u>REVERSED IN PART,</u>
<u>AND REMANDED</u>